947 So.2d 1079 (2004)
Louise HARRIS
v.
STATE.
CR-01-1748.
Court of Criminal Appeals of Alabama.
October 29, 2004.
Opinion Overruling Rehearing May 27, 2005.
Certiorari Denied October 21, 2005.
*1087 William R. Blanchard, Montgomery; and Stuart W. Gold, New York, New York, for appellant.
William H. Pryor, Jr., atty. gen., and Tracy Daniel and Jeremy W. McIntire, asst. attys. gen., for appellee.
*1088 William H. Pryor, Jr., and Troy King, attys. gen., and Tracy Daniel and Jeremy W. McIntire, asst. atty. gen., for appellee, on rehearing.
Certiorari Denied (as to State) October 21, 2005.
Alabama Supreme Court 1041437.
PER CURIAM.
On July 13, 1989, Louise Harris was convicted in the Montgomery Circuit Court of murder made capital because it was committed for a pecuniary or other valuable consideration or pursuant to a contract or for hire, an offense made capital by § 13A-5-40(a)(7), Ala.Code 1975.
The facts underlying Harris's conviction are as follows.
"The appellant was indicted for two counts of capital murder in the murder of Isaiah Harris: murder for pecuniary gain or pursuant to a contract for hire and murder of a deputy sheriff while the deputy was on duty. Following the introduction of the State's evidence, the appellant moved that the second count of the indictment be dropped, because she argues, the State failed to prove that Harris was on duty at the time of the offense. The trial court granted this motion, and the case went to the jury only on the first count of the indictment. The jury found the appellant guilty as charged in the first count of the indictment and recommended that she be sentenced to life imprisonment without the possibility of parole, seven jurors voting for life without parole and five voting for death by electrocution. Thereafter, a sentencing hearing was held before the trial court, after which the court ordered that the appellant be sentenced to death by electrocution.
"The record indicates that the appellant was involved in an affair with Lorenzo McCarter, a codefendant, while she was married to Harris. The appellant and Harris had experienced marital problems in the past, which the victim apparently believed he had solved when he promised to buy the appellant a house. The record indicates that the appellant asked McCarter to hire someone to kill her husband. McCarter approached a co-employee about doing `the job'; however, the co-employee refused and told his supervisor about the solicitation. McCarter then approached Michael Sockwell and Alex Hood, other codefendants, to commit the offense. McCarter knew that Sockwell owned a gun. Prior to the offense, the appellant met with the three men and was shown the gun. Sockwell and Hood were paid $ 100 in advance to commit the offense, with the promise that more money would be paid upon completion of the murder. The State presented evidence of the existence of various insurance policies on the victim's life, with the appellant specified as the beneficiary.
"The victim, who worked the night shift as a jailer, left his home at approximately 11:00 p.m. to go to work, after being awakened by the appellant a little later than usual. Immediately after Harris left home, the appellant paged McCarter on his beeper, giving the message that her husband was leaving. There was evidence that the appellant had paged McCarter on his beeper many times in the past to arrange liaisons. When he received the message in the instant case, McCarter was seated in Hood's car, located across the street from the entrance to the subdivision in which Harris and appellant lived. Also present in the car were Alex Hood and Freddie Patterson. Patterson was unaware of the conspiracy. Sockwell was hidden behind the hedge located at the entrance to the subdivision. Harris was driving to work in his own 1979 black Ford Thunderbird automobile. When Harris stopped at the stop sign at the entrance of the subdivision, Sockwell *1089 shot him once in the face at close range with a shotgun. As a result, the lower half of the victim's face was blown off, leaving his teeth, tongue, and `matter' from his face blown across the car. After the shot, the victim's vehicle traveled slowly across the highway and came to a stop in a ditch.
"When the victim failed to arrive at work by 11:25 p.m., a co-employee telephoned his home twice and spoke with the appellant. There was testimony that the appellant offered no assistance and that her speech was slow or sluggish. Two men, returning from work, discovered the victim's body shortly after midnight and telephoned the Montgomery Police Department. After the police arrived at the scene and identified the victim, several officers of the police department and employees of the Montgomery County Sheriff's Department went to the house of the victim and the appellant to notify the appellant of the victim's death. There was testimony that, upon being notified of the victim's death, the appellant began screaming and sobbing, but she shed no tears. Moreover, she became completely calm instantly in order to answer questions. A member of the Montgomery County Sheriff's Department, who knew both the appellant and the victim, testified that she asked the appellant why she did not appear to be upset, and that the appellant responded that she and the victim had been experiencing marital problems for some time. She also told the witness that she had engaged in several extramarital affairs, the current one being with Lorenzo McCarter. The appellant stated that she was in love with McCarter. In response to questions asked by an investigator with the sheriff's department, she responded that McCarter's car was broken down in the vicinity, and when asked if McCarter could have killed the victim, the appellant responded, `If he did kill him I didn't tell him to.' At trial, McCarter elected to testify against the appellant, in exchange for the prosecutor's promise not to seek the death penalty in his case."
Harris v. State, 632 So.2d 503, 508-09 (Ala.Crim.App.1992).
The jury recommended by a vote of 7-5 that Harris be sentenced to life in prison without the possibility of parole. The trial court rejected the jury's recommendation and sentenced Harris to death. This Court affirmed Harris's conviction and sentence of death. Harris v. State, 632 So.2d 503 (Ala.Crim.App.1992). The Alabama Supreme Court affirmed this Court's judgment, Ex parte Harris, 632 So.2d 543 (Ala.1993). The United States Supreme Court granted certiorari review in part, Harris v. Alabama, 512 U.S. 1234, 114 S.Ct. 2736, 129 L.Ed.2d 858 (1994),[1] and affirmed the Supreme Court's judgment, Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
This Court's certificate of judgment was issued on November 18, 1993. On June 22, 1995, Harris, through counsel, filed the instant Rule 32, Ala. R.Crim. P., petition.[2] On August 27, 1998, the circuit court issued an order summarily dismissing several of Harris's claims as being procedurally *1090 barred, but granted Harris leave to amend the petition as to several claims that the court found to be insufficiently pleaded. On November 23, 1998, Harris filed an amended petition. Ultimately, the circuit court dismissed all of Harris's claims except for her claim that the prosecution had used its peremptory challenges to exclude African-Americans from jury service because of their race in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and her claims that she had received ineffective assistance of counsel at trial and on appeal. On July 26 and 27, 1999, a hearing was conducted on those claims. Additional testimony, in the form of a deposition, was taken on July 28, 1999, and was provided to the circuit court. On October 3, 2001, closing arguments were heard and on April 16, 2002, the circuit court issued an order denying the amended petition. Harris appeals.
Before addressing Harris's claims on appeal, we note the following principles that apply to this Court's review of a circuit court's denial of a Rule 32 petition. Because Harris was convicted of capital murder, her direct appeal not only included review of the issues presented by Harris, but also the record was searched for "plain error." Ex parte Harris, 632 So.2d at 544; Harris v. State, 632 So.2d at 542. Thus, "even though this petition challenges a capital conviction and a death sentence, there is no plain-error review on an appeal from the denial of a Rule 32 petition." Dobyne v. State, 805 So.2d 733, 740 (Ala. Crim.App.2000), aff'd, 805 So.2d 763 (Ala. 2001), citing Pierce v. State, 851 So.2d 558, 563 (Ala.Crim.App.1999), rev'd on other grounds, 851 So.2d 618 (Ala.2002). "`In addition, "the procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed." State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993).'" Williams v. State, 783 So.2d 108, 112 (Ala.Crim.App.2000)(quoting Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App. 1995)).
Claims presented in a petition but not pursued on appeal are deemed to be abandoned. See, e.g., Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995)(holding that "[w]e will not review issues not listed and argued in brief"). New claims presented for the first time on appeal are not properly before the appellate court. See Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997)(holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition"). Claims listed in an appellate brief that do not include supporting argument, as required by Rule 28(a)(10), Ala. R.App. P., are not properly before this Court.
"[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." Ex parte White, 792 So.2d 1097, 1098 (Ala. 2001). However, where there are disputed facts in a post-conviction proceeding resolved by the circuit court "[t]he standard of review on appeal . . . is whether the trial judge abused his discretion when he denied the petition. Ex parte Heaton, 542 So.2d 931 (Ala.1989)." Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992). Notwithstanding the criteria for review, this Court has consistently held in postconviction proceedings that: "[i]f the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition. See Roberts v. State, 516 So.2d 936 (Ala.Cr. App.1987)." Reed v. State, 748 So.2d 231, 233 (Ala.Crim.App.1999).

*1091 I.
As in her petition, Harris first claims on appeal that the circuit court erred in denying relief on her claim that the prosecution exercised peremptory strikes against black venire-members in violation of Batson. Harris also claims that the procedural bars of Rule 32, Ala. R.Crim. P., do not apply to her Batson claim.
Harris argues that at trial she established a prima facie case of purposeful racial discrimination by the state in its exercise of peremptory strikes in violation of Batson. The circuit court denied relief on this claim, finding that it was procedurally barred because it was raised and addressed adversely to Harris at trial and on direct appeal. See Rules 32.2(a)(2), and 32.2(4), Ala. R.Crim. P. We agree with the ruling of the circuit court.
"In Batson [v. Kentucky, 476 U.S. 79 (1986)], the United States Supreme Court held that `the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.' 476 U.S. at 89."
Raspberry v. State, 615 So.2d 657, 657 (Ala.Crim.App.1992). Harris contends on appeal, as she did at trial, that the Montgomery County prosecutor "used 12 of 19 peremptory strikes to eliminate 12 of 18 total black venirepersons," thus, she says establishing an "overwhelming" pattern of discriminatory strikes when taken "in conjunction with other factors." (Harris's appellate brief at p. 16.)[3]
Harris's Batson claim was presented at trial, was raised on appeal, and has been reviewed for error. The circuit court correctly ruled in its final order that Harris's Batson claim was procedurally barred because it had been raised and addressed at trial and because it had been raised and addressed on direct appeal. See Rules, 32.2(a)(2) and (4), Ala. R.Crim. P.
However, Harris argues that these procedural bars should not apply in her case because, she says, her Batson claim was rejected by this Court and the Alabama Supreme Court in reliance on dicta from Harrell v. State, 571 So.2d 1270, 1271 (Ala.1990)("Harrell II") that was rejected in Ex parte Thomas, 659 So.2d 3 (Ala. 1994), while Harris's case was pending on certiorari review in the United States Supreme Court.
The Alabama Supreme Court in Harrell II stated: "When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." 571 So.2d at 1271.
After the release of this Court's opinion in Harris and its opinion in Ex parte Harris, the Alabama Supreme Court released Thomas, which clarified the above language from Harrell II and which is summarized below.
"[I]n Ex parte Thomas, 659 So.2d 3 (Ala.1994), the Court rejected th[e above] language in Harrell II. Specifically, the Court disapproved this statement to the extent that it had been construed to preclude a finding of a prima facie Batson violation. The Court *1092 disapproved this statement as it has been applied in these instances, because such applications prevent a defendant from using a factor indicating discrimination that was approved in both [Ex parte] Branch[, 526 So.2d 609 (1987),] and Batson. Such an application was not the Court's intent. Even before Thomas was decided in 1994, this Court, in Ex parte Bird, 594 So.2d 676 (Ala. 1991), considered the dictum of Harrell II but did not construe it to mean that a defendant cannot make a prima facie case if the percentage of blacks on the jury is greater than the percentage that was on the venire."
Nix v. Chilton County Comm'n, 667 So.2d 719, 720-21 (Ala.1995).
Harris argues that she is entitled to a review of her Batson claim following Thomas. She asserts:
"Precedent dictates that Thomas be applied to [her] Rule 32 application. It is clear that Batson and its progeny apply retroactively to Alabama cases `pending' at the time those decisions were rendered. This principle was firmly established in Ex parte Jackson, 516 So.2d 768 (Ala.1986), in which the Alabama Supreme Court rejected the Swain [Swain v. Alabama, 380 U.S. 202 (1965)] standard and applied Batson retroactively.
". . . .
". . . Because Thomas was decided while Harris's case was pending before the United States Supreme Court, that is, before it was final, she is entitled to receive the benefit of the Thomas standard. Ex parte Floyd, 571 So.2d 1234, 1235 (Ala.1990).
(Harris's appellate brief at pp. 21-22.)
Moreover, Harris argues:
"Because the Thomas standard was not articulated until [her] case was pending before the United States Supreme Court, her post-conviction petition was the first time that this claim could have been raised or considered. . . .
"Until a court reviews Mrs. Harris's Batson claim under the proper standard, it has not been `addressed' within the meaning of Rule 32. Mrs. Harris's evidence clearly establishes a prima facie case of purposeful racial discrimination. For the Court not to consider her Batson claim would result in a manifest injustice."
(Harris's appellate brief at pp. 24-25.)
Thus, according to Harris, because her direct appeal was not final, as that term is defined in Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), when Ex parte Thomas was released, she is entitled to have her Batson claim reviewed in accordance with the precedent set forth in Ex parte Thomas. We disagree.
"In Griffith v. Kentucky, the Supreme Court addressed the retroactive application of Batson, and held that Batson would apply to all cases that were still pending on direct appeal and were not `final' at the time Batson was decided." Ex parte Floyd, 571 So.2d 1234, 1236 (Ala.1990)(footnote omitted). In reaching its decision that Batson should apply retroactively, the Griffith court determined that Batson established a new rule of constitutional criminal procedure and recognized that "`[a] new rule of constitutional criminal procedure is normally applied retroactively to all cases pending [on] direct review when the rule is announced.'" Poole v. State, 846 So.2d 370, 376 (Ala. Crim.App.2001), quoting Clark v. State, 621 N.W.2d 576, 578 (N.D.2001) citing in turn Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). The Griffith court defined "final" as "a *1093 case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." Griffith v. Kentucky, 479 U.S. at 321 n. 6, 107 S.Ct. 708.
The Ex parte Thomas court's rejection of certain language in Harrell II is quite different from Batson's complete break from the precedent long established in Swain v. Alabama.
"The rule in Batson v. Kentucky is an explicit and substantial break with prior precedent. In Swain v. Alabama, the Court held that, although the use of peremptory challenges to strike black jurors on account of race violated the Equal Protection Clause, a defendant could not establish such a violation solely on proof of the prosecutor's action at his own trial. 380 U.S. [202,] at 220-226 [(1965)]. Batson overruled that portion of Swain, changing the standard for proving unconstitutional abuse of peremptory challenges."
Allen v. Hardy, 478 U.S. 255, 258-59, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).
Thus, the United States Supreme Court in Allen, and the Alabama Supreme Court in Ex parte Floyd, permitted retroactive review of cases not yet final on direct appeal because Batson represented "a new rule for the conduct of criminal prosecutions." Griffith v. Kentucky, 479 U.S. at 328, 107 S.Ct. 708.
The Alabama Supreme Court's clarification in Ex parte Thomas of the analysis set forth in Harrell II did not constitute a new principle of constitutional law or a new rule of constitutional criminal procedure.
"In Thomas, the Alabama Supreme Court held that the mere fact that the percentage of blacks on the jury is equal to or exceeds the percentage of blacks on the venire cannot negate what would otherwise be a prima facie case of racial discrimination. In other words, if a trial court would otherwise have found a prima facie case of racial discrimination, the court cannot find that no prima facie case exists solely because the percentage of blacks on the jury exceeds the percentage of blacks on the venire. Implicit in this holding is the requirement that a prima facie case of racial discrimination was actually established before the trial court used `statistics' to negate it. Thus, contrary to Perkins's contention, Thomas does not prevent the trial court from considering statistics, along with the numerous other factors set out in Ex parte Branch, 526 So.2d 609 (Ala.1987), in denying a defendant's Batson motion. In Thomas, the Supreme Court specifically stated:
"`We emphasize that our disapproval of the construction that has been given Harrell II [Harrell v. State, 571 So.2d 1270 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991)] does not mean that an increased percentage of blacks on the jury can never be a circumstance to be considered in ruling whether a discriminatory use of peremptory strikes has been shown. In a proper case, the fact that the percentage of blacks on the jury is higher than the percentage of blacks on the venire may be a factor to be considered in deciding whether a prima facie case of discrimination has been made or rebutted. However, where, as here, the prosecutor has used such a large portion of his strikes against blacks as to indicate a pattern of striking blacks from the venire, the fact that the jury has a higher percentage of blacks than the venire had does not mean that no prima facie case of discrimination has been made.'

*1094 "659 So.2d at 8 (emphasis added)."
Perkins v. State, 808 So.2d 1041, 1075 (Ala. Crim.App.1999)(first emphasis added), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).
Thus, because the Ex parte Thomas Court merely clarified the misconception that statistics favorable to the state negate a prima facie showing of racial discrimination and did not establish a new rule of criminal procedure, Harris was not due retroactive postconviction review of her Batson challenge. Thus, the circuit court correctly found the claim to be procedurally barred.
Moreover, "a prima facie case of racial discrimination [must] actually [be] established before the trial court [can] use[] `statistics' to negate it." Perkins v. State, 808 So.2d at 1075, aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). At Harris's trial Harris offered mere numbers to establish a prima facie case discrimination by the State during jury selection.
"`"A defendant making a Batson challenge bears the burden of proving a prima facie case of purposeful or intentional discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987).
"`". . . . "
"`Procedurally, the party alleging racial discrimination in the use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). "`It is important that the defendant come forward with facts, not just numbers alone, when asking the (trial) court to find a prima facie case.'" Mitchell v. State, 579 So.2d 45, 48 (Ala.Crim.App.1991), cert. denied, 596 So.2d 954 (Ala.1992), quoting United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990).'
"McElemore v. State, 798 So.2d 693, 695-96 (Ala.Crim.App.2000). `"A trial court's ruling on a Batson objection is entitled to great deference, and we will not reverse the trial court's Batson ruling unless it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala. 1987)."' McElemore v. State, 798 So.2d at 695 (quoting Pressley v. State, 770 So.2d 143, 144 (Ala.2000))."
Fitch v. State, 851 So.2d 103, 123-24 (Ala. Crim.App.2001). See also Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___ (Ala.Crim.App.2003)(pursuant to a plain-error review, there was no inference of gender discrimination in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), where prosecutor used 80% of peremptory strikes to remove females in violation of J.E.B. "Numbers alone are not sufficient to establish a prima facie case of discrimination."), citing Boyd v. State, 715 So.2d 825 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala. 1998).
As in Fitch, Harris offered only numbers, no facts, to support her claim that the principles of Batson had been violated. The trial court correctly ruled that the evidence before the court did not establish a prima facie showing of purposeful or intentional discrimination by the State in its exercise of peremptory strikes. Thus, the trial court correctly denied the Batson motion.
Based on the above, the circuit court's denial of relief on Harris's Batson claim based on procedural bars is affirmed.

II.
Harris contends that the circuit court erred in denying her relief, after a hearing, *1095 on her claims that she was denied effective assistance of counsel during the guilt phase of her trial.[4]
"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."
Wiggins v. Smith, 539 U.S. 510, 511, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

A.1
Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to maintain continuity in representation. In her petition Harris argued that she was unable to form a strong bond with any of her appointed counsel because inadequate compensation for appointed counsel forced a succession of counsel to withdraw from the case.
The circuit court correctly summarily dismissed this claim pursuant to Rule 32.2(a)(3), as a claim challenging the continuity of counsel that could have been, but was not, raised at trial.

A.2.
Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to obtain adequate compensation for her defense.
Trial counsel did file a motion seeking "reasonable and adequate compensation for counsel" for representing Harris as a capital defendant. The trial court denied this motion. Harris v. State, 632 So.2d at 509. "Trial counsel is not ineffective for having an objection overruled or a motion denied." Boyd v. State, 746 So.2d 364, 402 (Ala.Crim.App.1999). Thus, there is no merit to this claim.

A.3.
Harris contends that trial counsel was ineffective for failing to protect her right to an impartial jury because, she says, after filing a motion for a change of venue based on pretrial publicity, counsel elected not to vigorously pursue the motion and it was denied.
The substantive claim underlying this claim of ineffective assistance of counsel was presented at trial, raised on appeal, and reviewed for error. This court held on direct appeal that Harris had failed
"to prove that the community was saturated with prejudicial publicity.
". . . .
"Moreover, the appellant has failed to prove that there existed any actual prejudice against her. The jurors who indicated that they had any knowledge of the case were questioned individually concerning the extent of their knowledge, the source of that knowledge, and the ability to disregard the information and decide the case based upon the facts presented in court. No juror remaining on the venire indicated that he or she could not decide the case based on the facts presented and on the law as instructed by the court. Thus, there was no actual prejudice demonstrated by the appellant resulting from pretrial publicity. *1096 Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)."
Harris v. State, 632 So.2d at 517-18.
In addition to the ruling on direct appeal, which precludes a showing of the prejudice necessary to establish ineffective assistance of counsel, before trial each prospective juror swore that he or she was able to decide Harris's case on the evidence despite any prior knowledge of the case. "The fact that the prospective jurors were not wholly ignorant of the facts and issues in petitioner's case did not establish the actual prejudice necessary for a change of venue." Heath v. State, 536 So.2d at 149, citing Ex Parte Grayson, 479 So.2d 76, 80 (Ala.1985); Lokos v. State, 434 So.2d 818, 827-828 (Ala.Crim.App.1982), aff'd, 434 So.2d 831 (Ala.1983). Harris made no showing at her Rule 32 hearing that any juror had been prejudiced against her by pretrial publicity. Thus, the circuit court correctly ruled that Harris failed to meet her burden of proof pursuant to Rule 32.3, Ala. R.Crim. P., because Harris failed to prove any prejudice as required by Strickland.
Moreover, the circuit court ruled on the merits that counsel's decision not to vigorously pursue a change of venue was a strategic one. We agree. In his deposition, Bowen, one of Harris's trial attorneys, testified that he filed a motion requesting a change of venue but that upon reflection of the circumstances of the case, decided not to vigorously pursue a change of venue. Bowen provided the following reasons for not vigorously pursuing a change of venue despite the significant newspaper and television coverage concerning the case.
"The motion was really . . . an extremely tough call from my point of view. The Alabama law is that you transfer to the next county, free of exception. You're surrounded by Macon, Elmore, Autauga, Lowndes, Crenshaw. . . . Autauga is seventy-five to eighty percent white. . . . We really didn't want to do that. Not that this was really a black-white case, but we felt like as many black females as we could get on the jury, the better off we were.
". . . Let's say we might have won a transfer to Macon. But I believe Mr. Isiah Harris's family was from Macon County. . . . I just recall that in my mind, one of our decisions on that. The same thing with Elmore is it was predominantly white, although the black-white ratio was higher in Elmore than Autauga. Lowndes probably would have been the preferred county.
"But, truthfully, it was hard to get. If you were to make the motion for change of venue, you were really playing a game of Russian roulette, so to speak. In other words, if you had gotten Autauga, you would probably be in worse shape than you were . . . in my opinion, than you were in Montgomery. If you had gotten Lowndes, you would have been in . . . probably a better situation. But, know, the point you had to make on that is that although we filed that motion . . . I really felt in the back of my mind we had the most racially balanced county that we could get in Montgomery.

"Now, there was a problem, of course, because this was a Montgomery County deputy sheriff that was killed, and that was always a problem. But when you get down to whether you want Autauga County as opposed to Montgomery County, you know, I'm not sure I want Autauga County. I think I'm more inclined to go with Montgomery County because it's a racially balanced county, you know, roughly 50 percent-50 percent. And so there was a number of things that we thought about and that I thought about in this regard.

*1097 "So we did make the motion. We did go through the motion. We did think that we ought toBut after thinking about it, after halfway thinking about that thing and realizing that we may get sent to Autauga County, it was a scary thought. It really was a scary thought. It was a tough decision to make.
"Q. [Rule 32 counsel]: So . . . you didn't include any of the press coverage
"A: Right.
"Q:because you weren't so sure that you wanted to win the motion?

"A. . . . We originally started out, well, we need to do this because it's a deputy sheriff, and it's got a lot of press. But then again, you know, the press that you get from Montgomery, it spills over into some of the other counties, also.
"And then you understand that we're trying this case to win. We've got a racially balanced county, whereas we may end up with a racially imbalanced county detrimental to . . . what we're presenting. . . . It was a tough call. So I think in the middle of that, I got the feeling that I'm really not so sure that I want to go forward with this motion the way I originally presented it.
"In hindsight you think, well . . . maybe that was error, but we were trying to win the case.
(Rule 32 hearing, vol. 18, pp. 142-45.)(Emphasis added.)
Based on counsel's testimony, this court finds that counsel's strategic decision was made after reasonable consideration of options. "`Strategic choices made after thorough investigation of relevant law and facts are virtually unchallengeable.'" Bui v. State, 717 So.2d 6, 23 (Ala.Crim.App.1997)(quoting Lawley, 512 So.2d 1370, 1372 (Ala.1987)). We will refrain from using hindsight in evaluating trial counsel's decisions and affirm the circuit court's ruling on the merits.
Based on the above, we hold that the circuit court's ruling was correct.

A.4.
Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to conduct an adequate voir dire of the jury. Harris argues that four jurorsB.E., E.B., M.K.L., and S.M."were closely related to individuals who worked in law enforcement, but were not asked if that would bias them where the victim was a law enforcement officer." (Harris's brief on appeal at p. 62.) Additionally, Harris argues, "none of the jurors were questioned about their views on adultery, a sensitive issue on which the State was sure to focusand one that clearly affected the sentencing court. . . . Harris had a right to have both issues explored." (Harris's brief on appeal at p. 62.)
The circuit court ruled that "Harris failed to present any evidence in support of this claim." (Rule 32 Record, vol. 9, page 1705.) We agree. This claim of ineffectiveness amounts to nothing more than a bare allegation, unsupported by any factual basis; accordingly, it fails to satisfy either the burden-of-proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. Additionally the circuit court ruled on the merits finding that "the record refutes any claim of deficient performance on the part of trial counsel. The voir dire of the jury panel was conducted by the trial court. . . . Defense counsel submitted, however, `proposed voir dire questions,' covering the subjects Harris sets forth in the claim." (Rule 32 Record vol. 9, pp. 1705-06.) The record on direct appeal supports the circuit court's ruling. The record on direct appeal reflects that counsel submitted two separate sets of *1098 written proposed voir dire questions to the trial court. The written questions included a question to the jury panel regarding Harris's adulterous relationship with Lorenzo McCarter. "Trial counsel is not ineffective for having an objection overruled or a motion denied." Boyd v. State, 746 So.2d 364, 402 (Ala.Crim.App.1999).
Thus, Harris has not shown how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala. Crim.App.2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

A.5.
Harris contends that trial counsel were ineffective at the guilt phase of the trial because, Harris argues, counsel failed to properly litigate the State's alleged discriminatory use of peremptory challenges in jury selection.
Harris first claims that trial counsel allowed the prosecutor to misstate the numbers necessary to assess whether a pattern existed of strikes based on race.
Specifically, Harris argues:
"Trial counsel based its Batson motion exclusively on the (incorrect) facts that the State used 11 of its 19 peremptory challenges to strike all but 6 of 18 black venire members. . . . But in fact the State used 12 of 19 peremptory challenges to strike all but 5 of the 18 black veniremembers. . . . Counsel misstated the numbers to Mrs. Harris's disadvantage. . . . Indeed, with only 4 blacks on the petit jury (the fifth was an alternate) the judge, even applying the Harrell [v. State, 571 So.2d 1270 (Ala.1990)] standard, would likely have required the State to justify its strikes. Moreover, the trial court was searching for more evidence than a pattern of strikes. . . . But counsel presented nothing else, despite having filed its motion earlier. . . . Several other indicia of discriminatory conduct by the prosecution were available but ignored by defense counsel. . . . The failure to do so was plainly ineffective assistance."
(Harris's brief on appeal at pp. 62-63.)
As to this argument the circuit court ruled as follows:
"Harris additionally contends that the trial counsel were ineffective for allowing the prosecutor to `misstate' the number of blacks on the jury. This claim is denied. First, this claim does not appear in the amended petition for relief and is, therefore, denied due to Harris's failure to comply with the rules of procedure. Alternatively, it is denied because the number of blacks on the juryas represented by the prosecutor, the trial court, and the defense counselwas correct. . . . The following jury members, including the alternate, were African American: E.T., J.C., B.E., S.M., A.T., and P.C. Every one of these jurors is denoted as being black on petitioner's exhibits 44 and 47. Moreover, petitioner's exhibit 48Mr. Argo's notes from the `jury selection process'also indicates that B.E. was African American. The Court credits the perceptions and observations of trial counsel, the trial judge, and the District Attorneyeach of whom had substantial interest in observing the racial makeup of the jury."
(Rule 32 record, vol. 9 at p. 1707.)
We agree with the circuit court's ruling both on procedural grounds and on the *1099 merits. Harris's claim that trial counsel were ineffective for allowing the prosecutor to misstate the number of blacks on the jury was not raised in her original petition or in her amended petition, but was raised for the first time at the July 26, 1999, hearing on her Rule 32 petition. Because Harris was allowed to file an amended petition in order to fully present her claims of ineffective assistance of counsel, we do not consider this claim to relate back to the original petition. Thus, the claim was presented outside the limitations period and is procedurally barred pursuant to Rule 32.2(c), Ala. R.Crim. P. See DeBruce v. State, 890 So.2d 1068, 1094 (Ala. Crim.App.2003)("These claims would be timely if they related back to claims raised in the timely filed petition; however, the claims raised in the second amended petition did not relate back to any claims raised in the original petition. See Charest v. State, 854 So.2d 1102 (Ala.Crim.App. 2002)"). Moreover, the record also supports the circuit court's findings that jurors E.T., J.C., B.E., S.M., A.T., and P.C., are black.
Harris also claims that counsel were ineffective for failing to adequately support her Batson motion. According to Harris, in addition to the alleged pattern of strikes offered by the defense to establish a threshold prima facie case of discrimination, the "other indicia of discriminatory conduct by the prosecution" that were omitted by the defense in making its Batson motion were 1) the "history of purposeful discrimination by Ms. [Ellen] Brooks [the district attorney] and the Montgomery County District Attorney's Office," and 2) "of those persons struck, no other shared characteristic emerges" other than race. (Harris's brief at pp. 17 and 18.)
To prevail on a claim of ineffective assistance of counsel based on counsel's failure to make an adequate Batson objection, Harris must first show that there was a prima facie case of purposeful discrimination by the prosecutor in selecting the jury. Ex parte Frazier, 758 So.2d 611, 616 (Ala.1999).
At the time of trial, Batson motions were considered in light of Harrell II. As stated previously, Harrell II held that "[w]hen the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." 571 So.2d at 1271. Thus, because the trial court found that the jury reflected a greater percentage of blacks than the percentage of blacks in Montgomery County, counsel had no reason to pursue the Batson motion beyond the statistical offer that was made.[5] That the above quoted portion of Harrell II was later overruled by Ex parte Thomas, 659 So.2d 3 (Ala.1994), does not render counsel's performance ineffective. "[T]rial counsel cannot be held to be ineffective for failing to forecast changes in the law." Dobyne v. State, 805 So.2d 733, 748 (Ala.Crim.App. 2000) citing State v. Tarver, 629 So.2d 14, 18-19 (Ala.Crim.App.1993).
Moreover, on direct appeal, we considered whether the history of discriminatory practices by the Montgomery County District Attorney's Office in striking a jury was a factor in establishing a prima facie case of racial discrimination in Harris's case and found that it was not. See Harris *1100 v. State, 632 So.2d 503, 513 (Ala.Crim. App.1992).
Thus, Harris has not proven that trial counsel's conduct was deficient. Therefore, Harris has failed to establish ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in counsel's pursuit of the Batson claim.

A.6.
Harris contends that trial counsel were ineffective at the guilt phase of the trial because, Harris argues, counsel failed to develop an adequate defense strategy based on the following:
a. Counsel's interviews with Harris and her family were perfunctory. Counsel did not follow up on evidence of abuse or other evidence to find out what effect that evidence might have had on Harris's mental state or how it would affect the State's characterization of Harris as the mastermind behind her husband's murder or how it could explain her behavior on the night of the murder.
b. Counsel made no attempt to demonstrate any motive for McCarter to kill Mr. Harris, leaving the State to assert that McCarter acted because Harris asked him to.
c. Counsel's cross-examination of McCarter, Investigator Huggins, Officer Santina Jenkins, and Officer Dorinda Hinton was ineffective in that counsel failed to reduce the probative force of their testimony implicating Harris in the murder.
d. Counsel ignored cross-examination points and overlooked mental-health issues that cast doubt on Harris's ability to participate in this crime. The State's theory was that Harris spent months planning her husband's murder.
e. Counsel did nothing to rebut the State's implication that because Harris shed no tears over her husband's death and that she was faking her grief, which the State further implied was a sign of guilt.
f. Counsel failed to rebut unhelpful testimony; for example counsel failed to cross-examine Officer Jenkins, even though she worked with Mr. Harris and was probably biased toward the prosecution; failed to cross-examine McCarter on his plea agreement with the State, his alcoholism, his heavy drug use, his tendency toward blackouts, or his criminal convictions. Counsel also failed to impeach McCarter's statement that he knew Mr. Harris from one card game when McCarter also knew Mr. Harris from jail.
The circuit court essentially ruled that Harris failed to meet her burden of proof as to claims a, c, d, e. Also, to the extent that those claims related to abuse suffered by Harris, the circuit court ruled that the record reflected that counsel had information about abuse "but made a strategic decision not to pursue it." (Rule 32 record, vol. 9, p. 1708.) Moreover, counsel's decision not to bring abuse into the guilt phase of the trial was in part the result of a directive from Harris. As to claims b, c, and f, the circuit court also ruled that these witnesses did not testify at the Rule 32 proceedings. Thus, the circuit court correctly found that, without deciding whether counsel's performance was deficient, Harris presented no evidence demonstrating prejudice as required by Strickland.
Thus, Harris has not shown how her trial counsel's representation was ineffective under Strickland or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala.Crim.App. 2000); Brooks v. State, 695 So.2d 176, 182 *1101 (Ala.Crim.App.1996). Therefore, Harris has failed to establish ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in developing a defense strategy.
The circuit court's ruling in this regard on Harris's Rule 32 petition was correct.

A.7.
Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to challenge alleged misconduct by the state.

a.
Harris claims on appeal that there were "a number of uniformed sheriff's officers present in the courtroom during the trial." Moreover, according to Harris, "the bailiffs in the courtroom were connected with the Sheriff's Department and interacted significantly with the jury." (Harris's brief at p. 68.) In her amended petition, Harris presented this claim as follows:
"Trial counsel failed to object to the presence of an excessive number of uniformed sheriff's officers and bailiffs connected with the sheriff's department in the courtroom that were prejudicial to Harris in light of the fact that the victim was a deputy sheriff."
(Rule 32 record, vol. 6, p. 1059.)
The circuit court disposed of this claim, ruling:
"Harris did not present any support of this claim. She failed to demonstrate that there were in fact, what she deems an `excessive number of uniformed officers and bailiffs' present. Additionally, trial counsel did `object to members of the Sheriff's Department [escorting the jurors]' and that motion was denied. . . . Finally, the underlying issue was rejected by the Court of Criminal Appeals and the Alabama Supreme Court. See, Harris, 632 So.2d at 518."
(Rule 32 record, vol. 9, p. 1709.) The record supports the trial court's findings that there is no basis for this claim. Thus, this claim amounts to nothing more than a bare allegation, unsupported by any factual basis; accordingly, it fails to satisfy either the burden-of-proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal we ruled as follows regarding the substantive claim:
"The appellant argues that it was error for sheriff's deputies to manage and be in charge of the jurors during their sequestration and deliberations, in light of the fact that the victim was a deputy sheriff. The record reveals that the appellant objected on this ground at trial, and that the trial court responded that the deputies had long been assigned to court detail and that the trial court was familiar with them. The trial court further stated that the deputies were `well aware of their responsibilities.' There is no indication or claim by the appellant of any improper behavior by the deputies in this regard or of any improper communications between the deputies and the jury. Thus, there is no evidence of prejudice to the appellant."
Harris v. State, 632 So.2d at 518. "Trial counsel is not ineffective for having an objection overruled or a motion denied." Boyd v. State, 746 So.2d 364, 402 (Ala. Crim.App.1999).
Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *1102 Williams v. State, 782 So.2d 811, 825 (Ala. Crim.App.2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

b.
Harris claims that counsel was ineffective by allowing the State to emphasize to the jury the fact that Mr. Harris was a law-enforcement officer and because the State referred to members of Mr. Harris's family in front of the jury. Harris asserted in her brief that "[f]our jurors were related to law enforcement officers. . . . The victim, Isaiah Harris, was a law enforcement officer, a fact the State emphasized, even after the line-of-duty count was stricken. . . . And the State referred to members of Mr. Harris's family during the trial in the presence of the jury." (Harris's brief on appeal at p. 68.)
Specifically, in her petition, Harris presented the following claims:
"26. Trial counsel failed to object adequately to the presence of the victim's family in the courtroom, including and most importantly the victim's sister sitting at the prosecution table. . . . Counsel did not communicate to the court that the presence of the victim's family would function to engender the jury's passion and sympathy for the victim and would result in prejudice to Harris and denial of her right to a fair trial. The combination of the presence of members of the sheriff's department and the victim's family members was particularly prejudicial because four jurors were related to law enforcement officers. The likelihood that the presence of the victim's family and fellow officers in court would inflame the passion of the jurors against Harris was not raised adequately.
"27. Trial counsel failed to object adequately to improper testimony by and improper references to members of the victim's family during the trial. . . . The prosecutor drew attention to family members by asking the court's permission for them to leave even though proceedings were open and public."
(Rule 32 Record, vol. 6, p. 1060.)
In response to these claims, the circuit court ruled:
"Harris failed to present any evidence in support of these claims and has, therefore, failed to meet her burden of proof. The claims are additionally dismissed for failure to comply with Rule 32.6(b). Moreover, the underlying issues were rejected on direct appeal. See Harris, 632 So.2d 525. The claims are denied."
(Rule 32 Record, vol. 9, pp. 1709-1710.)
Thus, the record supports the circuit court's ruling that Harris's claims are unsupported by any factual basis; accordingly, they fail to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, we ruled that "the presence of the victim's family and evidence of victim impact did not constitute error." Harris v. State, 632 So.2d at 525.
Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala. *1103 Crim.App.2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

c.
Harris claims that trial counsel were ineffective by allowing the State to question Mr. Harris's sister regarding irrelevant matters for, Harris says, the sole purpose of engendering sympathy for Mr. Harris and creating bias against Harris. In her petition, Harris alleged:
"28. Trial counsel failed to object adequately to the testimony of the victim's sister regarding irrelevant matters, such as the victim's age, his overtime work at Christmas and how many children he had. . . . That testimony was immaterial and served only to inflame the jury's sympathy for the victim."
(Rule 32 Record, vol. 6, p. 1060.)
In response to this claim, the circuit court ruled:
"Harris failed to present any evidence in support of these claims and has, therefore, failed to meet her burden of proof. The claims are additionally dismissed for failure to comply with Rule 32.6(b). Moreover, the underlying issues were rejected on direct appeal. See Harris, 632 So.2d 525. The claims are denied."
(Rule 32 Record, vol. 9, p. 1710.) The record supports the circuit court's ruling that this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, we ruled that "the presence of the victim's family and evidence of victim impact did not constitute error." Harris v. State, 632 So.2d at 525.
Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala. Crim.App.2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

d.
Harris claims that trial counsel were ineffective for failing to object to the State's presentation of "gruesome photographs of Mr. Harris dead in his car. . . . As a contrast, and to further evoke passion and prejudice, the state introduced pre-death photographs." (Harris's brief at p. 69.) According to Harris, "none of the photographs served a legitimate purpose." (Harris's brief at page 69.)
Specifically, in her petition, Harris presented the following claim: "Trial counsel failed to object to the improper admission of pre-death photos of the victim." (Rule 32 Record, vol. 6, page 1060.) In response to this claim, the circuit court ruled:
"Harris has asserted nothing to support her contention that the admission of the photograph in question was improper. Her claim is, therefore, dismissed for failure to comply with Rule 32.6(b). Additionally, a claim that the introduction *1104 of the photograph was improper was rejected on direct appeal. See Harris, 632 So.2d at 530-31. Counsel is not ineffective for failing to assert on objection that has no merit."
(Rule 32 Record, vol. 9, p. 1710.)
Harris raises for the first time on appeal the claim that the State was improperly allowed to present gruesome photographs. New claims that petitioner presents for the first time on appeal are not properly before us. See Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997)(holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition").
Harris presented nothing at the Rule 32 hearing suggesting error or prejudice in trial counsel's failure to object to the pre-death photograph of Isaiah Harris. Thus, the record supports the circuit court's ruling that this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, we ruled that a photograph of the victim taken when he was alive was relevant and admissible "as it tended to identify the victim, especially in light of the condition of the victim's face after having been shot. As such, the introduction of this photograph during the guilt phase was not an Eighth Amendment violation." Harris v. State, 632 So.2d at 531.
Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala. Crim.App.2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as to this issue. The circuit court's ruling was correct.

e.
Harris claims that trial counsel was ineffective for failing to object to the State's reference before the jury to Harris's "breaking God's law." (Rule 32 Record, vol. 6, p. 1062, quoting p. 690 of record on direct appeal.) In response to this claim, the circuit court ruled:
"Harris presented no evidence or argument in support of this claim. In her proposed findings, she merely sets forth the claim as it appears in the amended petition. Moreover, the allegedly improper remark was not made during argument, but was part of a question asked by the prosecutor. The question was not improper."
(Rule 32 Record, vol. 9, p. 1711.) We agree with the ruling of the circuit court.
During the guilt phase of the trial the defense called Hyram Knight as a character witness for Harris. Mr. Knight testified on direct examination that Harris was "a good churchgoer . . . [and] an all `round good member of the church" and that she had a good reputation in the community for truth and honesty. (Direct Appeal Record vol. 4, p. 689.) On cross-examination the following exchange occurred:
"Q. [by the prosecutor]: Mr. Knight, you did not know of her affair while she was married to Isaiah Harris?
"A. No.
"Q. Would that change you opinion, if she was a good member of your church?

*1105 "A. No, it wouldn't.
"Q. It wouldn't matter to you that she was breaking God's law?
"A. (Witness shakes head from side to side.)
"Ms. Brooks [the prosecutor]: Thank you.
"Mr. Argo [defense attorney]: That's all. Thank you, Mr. Knight."
(Direct Appeal Record vol. 4, pp. 689-90.)
Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the above exchange. Thus, the record supports the circuit court's ruling that this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala. Crim.App.2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as to this claim. The circuit court's ruling was correct.

f.
Harris claims that trial counsel was ineffective for failing to "challenge" by way of rebuttal during closing arguments numerous alleged instances of the State's "playing to the jury's passion and bias" by "refocus[ing] the jury on the facts . . . that there was very little, if any, credible evidence to connect Harris to Mr. McCarter's plan to murder Mr. Harris." (Harris's brief at p. 70.) We note that in her petition, Harris claimed that "[t]rial counsel made no objection to any of these false and misleading statements" during the State's closing. (Rule 32 Record, vol. 6, page 1064.) These are different claims. New claims that petitioner presents for the first time on appeal are not properly before us. See Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997)(holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition"). However, in an abundance of caution we will review the claims placed before the circuit court. Harris presented 10 specific instances where Harris claims counsel were ineffective in this regard.
1. Harris claimed in her petition that trial counsel failed to object to the prosecution's misleading statement that "Alonzo Trimble had `absolutely nothing to gain by testifying' . . . although he had charges pending against him at the time he became involved in the case and was on probation at the time of trial." (Harris's brief at p. 70.)
Relying on this Court's opinion on direct appeal, the circuit court ruled that the prosecutor's comment "was not improper" thus, "Harris cannot demonstrate prejudice. See, Harris, 632 So.2d at 532; see also Id. at 523." (Rule 32 Record, vol. 9, p. 1712.)
The substantive claim underlying this claim was raised on appeal and has been reviewed for error. On direct appeal, we ruled
"The prosecutor's comment that State's witness . . . Trimble had nothing to gain w[as a] proper inference[ ] from the evidence. The evidence showed . . . that Trimble was in no way suspected of being involved [in the murder]. Moreover, there is no evidence of any bargains *1106 made in exchange for Trimble's testimony. These comments by the prosecutor were also proper as reply in kind to defense counsel's previous argument that [Trimble was] biased and had a motive for testifying for the State."
Harris v. State, 632 So.2d at 532.
Thus, there is no merit to Harris's assertion that counsel was ineffective in this regard. Moreover, Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
2. Harris claimed in her petition that trial counsel failed to object to the prosecution's misleading statement that "Mr. Trimble `has not changed [his] story at all' about the alleged telephone call made to him by Mrs Harris . . . although he had significantly" changed his story. (Harris's brief at p. 70.) The circuit court rejected this claim, finding that "[t]he Court of Criminal Appeals reviewed the comment and found no error. See Harris, 632 So.2d at 533-34." (Rule 32 Record, vol. 9, p. 1712.)
The substantive claim underlying this claim was presented at trial, raised on appeal, and reviewed for error. On direct appeal, we ruled:
"The prosecutor's statement that Trimble did not change his testimony concerning his voice identification of Harris was a proper argument. Although Trimble initially testified that the appellant was not identified as `the voice' on the telephone, subsequently, during a conference outside the presence of the jury, Trimble testified that he had misunderstood the trial court's initial question concerning the identification. Although an inference could be drawn that the witness intentionally changed his testimony, it is also possible that he misunderstood the question."
Harris v. State, 632 So.2d at 533-34.
Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
3. Harris claimed in her petition that trial counsel failed to object to the prosecution's misleading statement that "Freddie Patterson had `nothing to gain' by testifying, . . . although he had charges pending against him at the time he first talked to authorities." (Harris's brief at p. 70.) The circuit court denied this claim, finding "`[t]he . . . comment. . [was a] proper inference[] from the evidence.' Harris, 632 So.2d at 532." (Rule 32 Record vol. 9, p. 1712.)
The substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, this Court ruled:
"The prosecutor's comment that State's witness Patterson had no reason to lie . . . [was a] proper inference[] from the evidence. The evidence showed that Patterson was not an accomplice to the murder. . . . Th[is] comment[] by the prosecutor [was] also proper as reply in kind to defense counsel's previous argument that [Patterson was] biased and had a motive for testifying for the State."
Harris v. State, 632 So.2d at 532.
Thus, there is no merit to Harris's underlying claim in this regard. Moreover, *1107 Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. This claim, therefore, is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
4. Harris claimed in her petition that trial counsel failed to object to the prosecution's allegedly misleading statement that "`[t]here's no evidence that Lorenzo McCarter had a criminal record,' . . . although Mr. McCarter had prior convictions and arrests." (Harris's brief at p. 70.) Relying on this Court's opinion on direct appeal, the circuit court denied relief on this claim, ruling that "`[t]here was no evidence before the jury of any convictions.' Harris, 632 So.2d 533." (Rule 32 Record vol. 9, p. 1712.)
The substantive claim underlying this claim was presented on appeal and has been reviewed for error. On direct appeal, this Court ruled:
"The prosecutor's comments that there was no evidence that McCarter had a criminal conviction and that McCarter had made consistent statements concerning the murder since his arrest were proper inferences from the evidence. The record indicates that there was no evidence before the jury of any convictions, although McCarter had admitted that Harris got him `out' when he had been charged with driving under the influence. Moreover, McCarter's statements had not significantly changed since he had admitted his guilt."
Harris v. State, 632 So.2d at 533.
Harris presented nothing at the Rule 32 hearing suggesting that this Court's ruling on direct appeal was in error. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. Thus, Harris has not shown deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment.
5. Harris claimed in her petition that trial counsel failed to object to the prosecution's allegedly misleading statement that "Mr. McCarter would `have his day in Court, I assure you' . . . although he had a plea agreement with the State." (Harris's brief at p. 70.) The circuit denied this claim, relying on this Court's ruling on direct appeal that the prosecutor's comment was proper.
The substantive claim underlying this claim was presented on appeal and has been reviewed for error. When this claim was presented as a substantive issue on direct appeal, this Court ruled:
"The appellant also argues that the prosecutor's statement that Lorenzo McCarter would `have his day in court' was not a proper inference from the evidence. However, the record indicates that the agreement made by the State, in order to gain McCarter's testimony, was that the State would not seek the death penalty in McCarter's capital murder trial. There was no evidence that the charges against McCarter would be dropped or that McCarter would plead guilty to the capital offense. Moreover, even if McCarter were to plead guilty, the State would still have to prove his guilt. See § 13A-5-42, Code of Alabama 1975."
Harris v. State, 632 So.2d at 532.
Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, *1108 this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
6. Harris claimed in her petition that trial counsel failed to object to the "prosecutorial misconduct" of the prosecution's allegedly inventing the following facts: that "Harris had been drinking when a sergeant called her to say that Mr. Harris had not arrived at work . . ., although the State's witness, Officer Ralph Burton, testified that it sounded as if Harris was asleep when he called." (Harris's brief at p. 70.) The circuit court found trial counsel's decision to "exercise[] caution" in making objections during closing arguments to be sound strategy in light of the trial judge's failure to sustain any objections made during closing arguments. Thus, absent any evidence to the contrary, the circuit court correctly ruled that trial counsel's performance had not been deficient in this regard.
Moreover, the substantive claim underlying this claim was presented on appeal and has been reviewed for error. On direct appeal, this Court ruled:
"The prosecutor's comment that the appellant had possibly been drinking or was otherwise intoxicated when she was called concerning the victim's whereabouts on the night of his murder was a proper inference from the evidence. There was testimony that the appellant's speech was slurred and sluggish during the telephone call and, when questioned the witness, who had placed the call, stated that he was uncertain whether this could have been the result of a state of intoxication."
Harris v. State, 632 So.2d at 533.
Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
7. Harris claimed in her petition that trial counsel failed to object to the "prosecutorial misconduct" of the prosecution's allegedly inventing the following facts: "Harris wanted to kill her husband because he was getting a car loan . . ., although there was no evidence Harris knew of any loan." (Harris's brief at p. 71.) The circuit court found trial counsel's decision to "exercise[] caution" in making objections during closing arguments to be sound strategy in light of the trial judge's failure to sustain any objections made during closing arguments. Thus, absent any evidence to the contrary, we conclude that the circuit court correctly ruled that trial counsel's performance had not been deficient in this regard.
The substantive issue underlying this claim was presented on appeal and has been reviewed for error. When presented as a substantive issue on direct appeal, this Court ruled:
"The prosecutor's comment that the appellant wanted the victim killed by Friday because of a car loan was also a proper inference from the evidence. Trimble testified that the appellant had stated she wanted the victim killed by Friday because he was dipping into his insurance policies in order to build an addition onto their house. There was also testimony that the appellant knew that her husband was in the process of purchasing an automobile for her daughter. The prosecutor further stated that the car loan did not `come through' as a *1109 reply in kind to defense counsel's argument during his closing statement, wherein he stated:
"`Look at this loan application that they've made a big to-do over. Take this back and look at it. Sergeant Harris was buying a car for Louise's daughter. Eight hundred and fifty dollars. They have been trying to tell you all this time she had to get him killed before he got the eight hundred and fifty dollars. Now this is real important to them. They struggled to get this in. They  you know, they brought witnesses up here and they got it in and here it is. Take this application back and look at it. If you don't know from your own experience, this application is going to tell you. When you go down to get a loan at the Credit Union you have credit life on it, and it's right there  credit life. Now what does that mean? We all know if Sergeant Harris had gotten the eight hundred and fifty dollars and then been killed, the loan would have been paid for and they would have had another car in the family.'"
Harris v. State, 632 So.2d at 533.
Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
8. Harris claimed in her petition that trial counsel failed to object to the "prosecutorial misconduct" of the prosecution's allegedly inventing the following facts: "Harris moved out of her in-laws' house in order to carry on an affair with Mr. McCarter . . ., although Harris had moved out of the house owned by her in-laws before she met Mr. McCarter." (Harris's brief at p. 71.) The circuit court found trial counsel's decision to "exercise[] caution" in making objections during closing arguments to be sound strategy in light of the trial judge's failure to sustain any objections made during closing arguments. Thus, absent any evidence to the contrary, we conclude that the circuit court correctly ruled that trial counsel's performance had not be deficient in this regard.
The substantive claim underlying this claim was presented on appeal, and reviewed for error. When presented as a substantive issue on direct appeal, this Court ruled:
"The comment by the prosecutor that the appellant moved out of her mother-in-law's house so that she could have the privacy in which to carry on an affair was a reasonable inference from the evidence. There was evidence presented that the appellant was very unhappy with the fact that she was living with the victim's mother, and there was also evidence that the appellant had been involved in other extramarital affairs prior to the one with Lorenzo McCarter."
Harris v. State, 632 So.2d at 533.
Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
9. Harris claimed in her petition that trial counsel failed to correct what she says was the prosecutor's mischaracterization that "without their agreement with *1110 McCarter, he `would have taken the 5th amendment, just like [Sockwell and Hood], because he was guilty and involved, and he told you,' the obvious point being that Messrs. Sockwell and Hood would implicate (and their silence did implicate) Harris. . . . Harris's counsel did not object or seek corrective instruction." (Harris's brief at p. 71.) The circuit court ruled as follows:
"Argo and Bowen both testified that they exercised caution when deciding whether to object to arguments of the prosecutor. Mr. Argo stated that `generally I don't think you make a lot of objections in closing, particularly, unless it's just grossly obvious that the evidence is not there. I don't think Judge Thomas is going to sustain one, anyway. . . . Bowen gave a similar response. . . . This general approach to making objections is reasonable. Moreover, it appears to be especially applicable before Judge Thomas, who did not sustain a single objection made during closing argument. In this context, the Court reviews and denies all claims regarding a failure to object to allegedly improper argument. Moreover, because the comment set forth in [the instant claim] was not improper, no showing of prejudice can be made. See Harris, 632 So.2d at 533."
(Rule 32 Record vol. 9, p. 1711.)
The substantive issue underlying this claim was presented on appeal and has been reviewed for error. On direct appeal, this Court ruled:
"The prosecutor's reference to the fact that Alex Hood and Michael Sockwell invoked their Fifth Amendment right to remain silent was made pursuant to her explanation of the agreement made by the State to obtain McCarter's testimony. Although the appellant argues that this comment was error under Ex parte Tomlin, 540 So.2d 668 (Ala. 1988), the present case is readily distinguishable. In Ex parte Tomlin, the Alabama Supreme Court held that it was prosecutorial error for the State to repeatedly refer during closing argument to the fact that the defendant's wife could not be called to testify. The Court held that this comment implied that the defendant's wife was not testifying because she knew something that would implicate her husband. In the present case, the two witnesses took the stand and refused to testify in front of the jury. Moreover, no close relationship exists between these witnesses and the appellant, which would lead to the inference that these witnesses knew that the appellant was guilty and were refusing to testify in order to protect her. More reasonably, these witnesses' refusal to testify would have been a matter of self-protection. Because the jury was well aware of the fact that the two witnesses refused to testify, the prosecutor was merely commenting on the evidence."
Harris v. State, 632 So.2d at 532-33.
Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
10. Harris claims in footnote 79 of her brief on appeal that trial counsel was ineffective for failing to "address effectively that Harris received a $100 check from Mr. McCarter because he was repaying a loan she made him to fix his car (the $100 she gave him that he claimed was to hire Messrs. Sockwell and Hood.)" (Harris's brief at p. 67.)
*1111 The circuit court disposed of this claim as follows: "Regarding the check, Harris failed to present any evidence or argument in support of the allegation and, therefore, demonstrate prejudice. Moreover, there was no deficient performance. Trial counsel made effective use of it during closing argument." (Rule 32 Record, vol. 9, p. 1710.)
Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
Thus, as to ineffective assistance of counsel claims 1 through 10, Harris has not shown how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had his trial counsel performed differently regarding these claims. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala.Crim.App. 2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to establish ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The circuit court's rulings were correct.

g.
Harris claims that trial counsel were ineffective because they failed to ensure that the trial court properly instructed the jury.
1. Harris claims that trial counsel were ineffective when counsel failed to request a jury charge stating that accomplice testimony must be corroborated by independent evidence that connects the defendant with the offense. According to Harris, the trial court incorrectly charged: "`[a] conviction for a felony offense cannot be had on the testimony of an accomplice or of numerous accomplices unless such testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense.'" (Harris's brief at p. 72, quoting the record on direct appeal at vol. 5, pp. 937-38.) The circuit court ruled:
"Harris failed to present any evidence in support of this claim and the complaint regarding the instruction in question was raised on direct appeal. (Harris's direct appeal brief at p. 117). . . . This claim is denied."
(Rule 32 Record vol. 9, p. 1715.)
We find no merit to this claim. Section 12-21-222, Ala.Code 1975, provides:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
The given charge followed the substance of the statute. Thus, trial counsel had no grounds on which to base an objection and the trial court correctly held that trial counsel was not ineffective. Thus, the circuit court correctly denied the claim.
Moreover, any "error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of the accomplice has been corroborated." Zieglar v. State, 886 So.2d 127, 142 (Ala.Crim.App.2003). The substantive issue underlying this claim was raised on appeal and has been reviewed for error. Regarding accomplices, we ruled on direct appeal that "neither Patterson nor Trimble were accomplices." Harris v. State, 632 So.2d at 537. We further ruled on direct *1112 appeal that "the question of complicity constituted a question of fact for the jury to decide and, by its verdict, it is clear that it found sufficient corroboration of accomplice testimony." Id. Also on direct appeal we found that accomplice testimony was sufficiently corroborated by the following testimony:
"Patterson was present with the majority of the coconspirators during the commission of the offense. He testified to a female voice broadcasting over McCarter's beeper the message `He is leaving.' Trimble testified that he was solicited by the appellant to commit the offense. Moreover, she was implicated by her conduct upon learning of her husband's death and by her statement that, if McCarter committed the offense, she did not tell him to do so. Moreover, she admitted to her affair with McCarter and to having had marital problems with the victim.
"`. . . . '
". . . The State presented corroborative evidence to connect the appellant with the commission of the offense."
Harris v. State, 632 So.2d at 537.
Harris presented nothing at the Rule 32 hearing suggesting deficient performance in trial counsel's failure to object or prejudice as a result of that failure. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.
Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., Williams v. State, 782 So.2d 811, 825 (Ala. Crim.App.2000); Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The circuit court's ruling was correct.[6]
2. Harris contends that all of trial counsel's errors, in the aggregate, require that Harris be given a new trial. This claim was not presented to the circuit court. See Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997)(holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition"). Therefore this issue is not reviewable.
Moreover, even if the claim were properly before us, we note that Harris would not be entitled to relief on this claim.
"`"`[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made.'" Stringfellow v. State, 485 So.2d 1238, 1243 (Ala.Cr.App.1986). "Even though there were several instances where counsel could have objected, `that does not automatically mean that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel.' Ex parte Lawley, 512 So.2d 1370, 1373 (Ala.1987)." O'Neil v. State, 605 So.2d 1247, 1250 (Ala.Cr.App.1992). As this Court observed in Graham v. State, 593 So.2d 162, 166 (Ala.Cr.App.1991):
"`"The lawyer whose performance the appellant now attacks zealously and vigorously defended the appellant. *1113 No particular decision to object or not object, even if it is a bad decision, is in itself proof that counsel's performance fell below acceptable professional standards."'"
DeBruce v. State, 890 So.2d 1068, 1090 (Ala.Crim.App.2003)(quoting Daniels v. State, 650 So.2d 544, 555 (Ala.Crim.App. 1994)).

III.
Harris contends that the circuit court erred in denying her relief, after a hearing, on her claims that she was denied effective assistance of counsel during the penalty phase of the trial.
"In order to obtain a reversal of [a] death sentence on the ground of ineffective assistance of counsel, [an appellant] must show both (1) that the identified acts or omissions of counsel were deficient, or outside the wide range of professionally competent assistance, and (2) that the deficient performance prejudiced the defense such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different. Bolender v. Singletary, 16 F.3d 1547, 1556-57 (11th Cir.) (citing Strickland, 466 U.S. [668] at 687, 104 S.Ct. [2052] at 2064 [(1984)]), cert. denied, [513] U.S. [1022], 115 S.Ct. 589, 130 L.Ed.2d 502 (1994)."
Baxter v. Thomas, 45 F.3d 1501, 1512-13 (11th Cir.1995)(emphasis added).
Concerning the presentation of mitigating evidence during the penalty phase, the United States Supreme Court in Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), held that the "principal concern in deciding whether [counsel] exercised [the] `reasonable professional judgmen[t],'" required by Strickland, is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was itself reasonable." Wiggins, 539 U.S. at 522-23, 123 S.Ct. 2527. It is within the framework announced in Wiggins that we analyze counsel's preparation for the penalty phase in Harris's case.
Harris contends in her petition, as she does on appeal, that trial counsel's decision to forgo an investigation into possible mitigating evidence constituted deficient performance. She also contends that she suffered prejudice as a result of counsel's deficient performance because, she says, the abundance of available mitigating evidence, if it had been presented to the trial court, would have persuaded more jurors to vote in favor of life imprisonment without parole. She also argues that the mitigating evidence that could have been presented would have outweighed the one aggravating factor found to exist by the trial court in imposing death and would have led to the trial court's imposing a sentence of life imprisonment without parole.
In denying this claim on the merits, the circuit court found that neither counsel had "a clear recollection of what was done in order to investigate for a possible penalty phase." (Rule 32 Record vol. 9, p. 1716.) However, the circuit court determined that it would "not consider trial counsel's inability to recall in favor of a finding of ineffective assistance. Where the record is unclear, the court [would] assume that counsel acted in a manner consistent with the counsel required by the Sixth Amendment." (Rule 32 Record vol. 9, p. 1716.) The court found that counsel made a reasonable "strategic decision" to adopt the testimony of the guilt-phase character witnesses as mitigating evidence in the penalty phase. The circuit court found this strategy to be acceptable, apparently, because some jurors where crying when the guilty verdict was returned *1114 and it was reasonable that counsel wanted to "[t]ake[] advantage of that atmosphere" in the penalty phase. (Rule 32 Record vol. 9, p. 1717.) The court found that counsel made a reasonable "strategic decision" by declining to present evidence of abuse Harris allegedly suffered as evidence at the penalty phase mitigating a death sentence. The circuit court reasoned that this was acceptable because Harris continued to maintain her innocence during the penalty phase and because "[c]ounsel continued to attack the state's case against Harris throughout the penalty phase." (Rule 32 Record, vol. 9, p. 1717.) The circuit court concluded by finding that counsel's effectiveness was evidenced by the fact that the jury recommended a sentence of life imprisonment without parole.
The circuit court also found that counsel's efforts before the sentencing judge were successful because the presentence officer presented favorable testimony for Harris and he recommended that she be sentenced to life imprisonment without parole. The circuit court also found it to be reasonable strategy that counsel relied on "residual doubt" to stress to the sentencing judge the weaknesses in the State's case. Based on the above, the circuit court found that Harris had not met her burden of proving that counsel's performance was deficient in this regard.
The circuit court concluded by finding that Harris failed to demonstrate that she suffered prejudice as a result of counsel's alleged deficient performance. The circuit court found that Harris failed to establish that there was a "reasonable probability that, had the evidence she presented at the Rule 32 hearing been presented at trial, the outcome would have been different." (Rule 32 Record, vol. 9, p. 1718.) The circuit found that "[m]uch of the testimony was either irrelevant, too remote to weigh heavily against the death penalty, or cumulative to the evidence presented at the trial, including Harris's testimony." (Rule 32 Record, vol. 9, p. 1718.) Citing to Boyd v. State, 746 So.2d 364 (Ala.Crim.App. 1999), the circuit court opined that even had the testimony presented at the Rule 32 hearing been presented at the sentencing hearing it is unlikely that the trial court would have sentenced Harris differently because the sentencing court found that counsel "did a thorough job of presenting non-statutory mitigating circumstance evidence" and because the "sentencing court held that the one aggravating circumstance far outweighed the mitigation and, on direct appeal, the Court of Criminal Appeals agreed with that finding. Harris, 632 So.2d at 542-43." (Rule 32 Record vol. 9, p. 1719.)
Finally, the circuit court did not credit the testimony of Dr. Martha T. Loring and Dr. Robert D. Shaffer regarding the nature of Harris's mental health. The circuit court continued by stating that even if it did credit the testimony of Dr. Loring and Dr. Shaffer, "the disorders [Harris] allegedly suffers from had absolutely nothing to do with the commission of the crime . . . [and] were not a factor in her committing the murder. The testimony would not have changed the outcome of the trial." (Rule 32 Record vol. 9, p. 1719.) The circuit court concluded: "The court cannot find that there is a reasonable probability that the additional evidence presented in these proceedings would have altered that decision." (Rule 32 Record vol. 9, p. 1719.) We disagree.

Deficient Performance
"To establish deficient performance, a petitioner must demonstrate that counsel's representation `fell below an objective standard of reasonableness.' [Strickland v. Washington, 466 U.S. 668] at 688 [(1984)]. We have declined to articulate specific guidelines for appropriate *1115 attorney conduct and instead have emphasized that `[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' Ibid."
Wiggins v. Smith, 539 U.S. at 521, 123 S.Ct. 2527.
First we note that "Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation." Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___, ___ (Ala.2003).
"To determine the appropriate sentence, the sentencer must engage in a `broad inquiry into all relevant mitigating evidence to allow an individualized determination.' Buchanan v. Angelone, 522 U.S. 269, 276 (1998). Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation. Jacobs v. State, 361 So.2d 640, 652-53 (Ala.1978). See § 13A-5-45(g), Ala.Code 1975 (`The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52.'). `[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring specially)."
Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___, ____ (Ala.2003). Thus, the circuit court's finding that the evidence of Harris's background was too remote in time to be admissible was an abuse of discretion.
Second we note that,
"`An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.' Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.), cert. denied, 513 U.S. 1009, 115 S.Ct. 532, 130 L.Ed.2d 435 (1994). The failure to do so `may render counsel's assistance ineffective.' Bolender [v. Singletary], 16 F.3d [1547] at 1557 [(11th Cir.1994)]."
Baxter v. Thomas, 45 F.3d at 1513.
Eric Bowen, Harris's lead counsel at trial, testified at the Rule 32, Ala. R.Crim. P., proceeding via a deposition. Bowen testified that he "assume[d]" that he and Argo met with Harris's relatives to ascertain information helpful to the defense but "[he] really can't recall it." (Volume 18 of Rule 32 hearing at p. 37.) However, Bowen testified that, before trial, he asked Harris to write a synopsis of her life. Based on the synopsis, one of Bowen's initial meetings with Harris concerned the option of pursuing a battered-woman defense during the guilt phase of the trial. Bowen said that he felt that "we could probably prove . . . [that Harris had been beaten by three husbands], if it really did occur, by talking to family members, people that might know." (Volume 18 of Rule 32 hearing at p. 16.) However, Bowen stated that Harris categorically rejected that defense for the guilt phase and "unequivocally den[ied] any involvement in the murder of her husband." (Volume 18 of Rule 32 hearing at pp. 17, 28.)[7] Based on Harris's statements to her attorneys, the theory of defense during the guilt phase of the trial was "that [Harris] had no part in *1116 the killing of [her] husband," and that McCarter implicated Harris in the murder so that he could make a deal with the district attorney to save his own life. (Volume 18 of Rule 32 hearing at p. 24.)
As strategy for the penalty phase, Bowen stated that he understood that "literally anything" could be presented as mitigation evidence during the penalty phase. He asserted that before trial he did ask Harris "about her background specifically for the purpose of investigating possible mitigating evidence." (Volume 18 of Rule 32 hearing at pp. 33 and 36.) According to Bowen, that is how he found out about Mrs. Louise Starr, a character witness presented during the guilt phase of the trial.[8] However, there was no investigation into Harris's life history or of her abusive relationships. Bowen stated that "[he] never considered the evidence of abuse" for purposes of mitigation because "I think that would have been opposed to [Harris's] wishes because I think at the penalty stage, she was still maintaining, and even maybe to the trial judge, that she was not guilty." (Volume 18 of Rule 32 hearing at p. 38.) Thus, Harris's penalty-phase strategy was to maintain her innocence before the jury, also known as fostering "residual doubt" as to her guilt, and presenting of evidence showing her good character. However, Bowen stated that he did not know if presenting evidence of spousal abuse during the penalty phase would have been against Harris's wishes because "[w]e didn't discuss that, so I can't really tell you that it was against [Harris's] wishes." (Volume 18 of the Rule 32 hearing at p. 77.)(Emphasis added.)
As to the physical abuse allegedly suffered by Harris, Bowen stated that he was not aware that John Wesley Robinson, Harris's first husband, had "struck her and otherwise abused her during their marriage." (Volume 18 of the Rule 32 hearing at p. 71.) Bowen was not aware that Jesse Lee Hall, Harris's common-law husband, "beat her during their relationship." (Volume 18 of the Rule 32 hearing at p. 72.) He did not know that Hall was so violent that he was later convicted for the beating death of a subsequent wife, Annie Bledsoe. (Volume 18 of the Rule 32 hearing at p. 75.) Bowen stated that had he known that Harris had been abused by Robinson and Hall he might have presented the information during the penalty phase.
Bowen likewise was not aware that McCarter had abused and threatened Harris. (Volume 18 of the Rule 32 hearing at p. 77.)
Bowen did not investigate for possible mitigating evidence even though there was information noted in his case file suggesting the existence of mitigating evidence in addition to that of physical abuse suffered by Harris in her relationships with men. Bowen testified that his case file included a competency report on Harris from Taylor Hardin Secure Medical Facility. This report stated that Harris had been raped when she was 10 or 11 years old. Bowen testified that he was sure he read the report before trial. He could not provide a reason for not presenting at the penalty phase the fact of the rape and conceded that the presentation of evidence that Harris was raped as a child during the penalty phase "would have been okay." (Rule 32 Record vol. 18, p. 60.)
Another fact contained in the Taylor Hardin report was the fact that Harris's father had been "ambushed after getting *1117 out of the car or driving up to a gate or stopped" and that Harris had discovered his body. (Rule 32 Record vol. 18, p. 60.)[9] Bowen was aware of this incident, but he felt that it was too close factually to the instant case to present during the penalty phase as evidence in mitigation. This may have been a sound strategic decision; however, the jury learned the circumstances of her father's death during the guilt phase of the trial and Bowen never considered the fact that Harris discovered the body of her murdered father worthy of garnering sympathy during the penalty phase.
Bowen did not recall whether he knew that Harris's sister had died in her arms when Harris was 14, even though this information was noted in his case file. However, Bowen stated that if he had known this fact "I think really that I probably might have" used it as mitigating evidence. (Volume 18 of the Rule 32 hearing at p. 64, 66). Despite the fact that the event was traumatic, Bowen stated that he probably would not have presented during the penalty phase evidence that Harris's house had burned down when she was 14 years old, around Christmas, shortly after her sister had died. Bowen considered this "a fortuitous event like that may not have registered with me at the time." (Volume 18 of the Rule 32 hearing at p. 67.) Bowen stated that he probably read in his case file that Harris's younger brother had drowned, but he did not recall knowing that Harris had seen the body being recovered from the river. He stated that if he had recalled that event he probably would have presented it during the penalty phase "as to trauma and things like that that she might have suffered." (Volume 18 of the Rule 32 hearing at p. 68.)
Thus, Bowen did not conduct any investigation as to possible mitigating evidence based on the synopsis of her life she prepared, his conversations with Harris, or any other information in counsel's case file. Instead, Bowen's strategy for the penalty phase was to adopt[10] all the character evidence from the guilt phase. Five character witnesses had testified during the guilt phaseEddie Bell, Hyram Knight, Louise Starr, Peggy Warner, and Helen Green. However, Bowen correctly conceded that their testimony was "quite limited" to "Harris's general reputation in the community, very general, and reputation for telling the truth." (Volume 18 of Rule 32 hearing at page 48 and 49.) Specifically, Bowen stated:
"As far as the character evidence, we had Mrs. Louise Starr, Bart Starr's mother. We had a lady who had been maybe on top of her profession in the financial world who knew Louise Harris. We had some other folks, you know, maybe from the church. We had what we thought were really good character witnesses that had known Ms. Harris for a long period of time, and so obviously we had that in mind, I mean, not just for the guilt stage but also for the sentencing stage."
(Volume 18 of Rule 32 hearing at page 35-6.) The record from the direct appeal reflects that the trial court granted Harris latitude in questioning four of these five character witnesses. In addition to asserting that they knew Harris to have a good reputation in the community for telling the truth and being honest, Bell and Knight, *1118 both of whom had known Harris since she was a very young child, testified regarding Harris's active participation in the church and that she was a hard worker; Starr, who had known Harris since she was a young teenager, was allowed to testify that Harris had always been well thought of in the community, that she was active in school, and that she had played in the school band, and sang in the church choir; Warner, for whom Harris had done housework for 10 years, testified that Harris was a hard and trustworthy worker whom Warner "absolutely" trusted to keep her child. (Record on direct appeal vol. 4, p. 695.)
Knox Argo, cocounsel with Bowen, testified at the hearing on Harris's Rule 32, Ala. R.Crim. P., petition. Argo testified that he had little recollection of what happened in the case 10 years ago, but that he did remember "talking to some of [Harris's] employers, and seemed like one of the church members." (Volume 15 of Rule 32 hearing at p. 87.) He stated that he had "[a] vague recollection" of meeting with Harris's family members in his office before her trial but not a strong recollection. (Volume 15 of Rule 32 hearing at p. 92.) Argo stated that he did not recall "anything about the substance of that meeting." (Volume 15 of Rule 32 hearing at p. 93.) Argo stated that he recalled a conversation with Bowen concerning offering additional witnesses at the penalty phase but he did not recall the specifics of the conversation. (Volume 15 of Rule 32 hearing at p. 123.) However, Argo did not recall any discussions about what should be done regarding mitigating evidence. (Volume 15 of Rule 32 hearing at p. 121.) He stated that the evidence presented during the guilt phase regarding Harris's general reputation in the community for telling the truth by witnesses Eddie Bell, Hyram Knight, Louise Starr, Peggy Warner, and Helen Green "was basically mitigation." (Volume 15 of Rule 32 hearing at p. 122.)
No investigation into possible mitigating evidence was conducted, even though several documents recovered from Argo's case file indicated the existence of possible mitigating evidence. An emergency-room medical record obtained from Argo's file indicated that Harris had stated as the reason for her visit to the emergency room that her husband had hit her in the head with a cooking pot. (Volume 15 of Rule 32 hearing at pp. 124-25.) Another document contained in Argo's case file reflected that Harris's house burned down two days after Christmas when she was 14; that John Wesley Robinson, her first husband, had beat her; and that Jesse Lee Hall, her common-law husband, had abused alcohol and had beat her. (Volume 15 of Rule 32 hearing at p. 127). Argo did recall a document from his file reflecting that there had been a divorce proceeding between Harris and the victim where Harris had accused the victim of beating her. (Volume 15 of Rule 32 hearing at p. 114.) A municipal court complaint in Argo's file alleged that the victim had hit Harris with a cooking pot and that he had pulled his .357 Magnum pistol on her. (Volume 15 of Rule 32 hearing at p. 129.) A notation in Argo's file indicated that Harris had told Argo that McCarter had a drinking problem and that he had threatened Harris's daughter. (Volume 15 of Rule 32 hearing at pp. 130, 132.) None of the information above was investigated as possible mitigating evidence, nor was it presented during the penalty phase of Harris's trial.
Argo explained that the point of the defense, other than obtaining an acquittal, was to get Harris a sentence of life imprisonment without parole, which he and Bowen had accomplished during the penalty phase before the jury. However, counsel's satisfaction with the jury recommendation *1119 of life in prison without the possibility of parole completely discounted the fact that the penalty phase of a capital murder trial is a two-part process, in the second part of which the trial court had the option of overriding the jury's recommendation based on the trial court's independent weighing of the aggravating circumstances against the mitigating circumstance. Moreover, Harris argued at the Rule 32, Ala. R.Crim. P., hearing that it was vitally important to acquire at least eight votes for a sentence of life imprisonment as opposed to death because the trial judge in her case, Judge Randall Thomas, had a history of overriding a jury's recommendation of life imprisonment without the possibility of parole where less than eight jurors had voted for a sentence of life imprisonment. See Acres v. State, 548 So.2d 459, 460 (Ala. Crim.App.1987)(Judge Thomas overrode a jury's 7-5 recommendation of life imprisonment); Hooks v. State, 534 So.2d 329, 332 (Ala.Crim.App.1987)(Judge Thomas overrode a jury's 7-5 recommendation of life imprisonment); Wagner v. State, 555 So.2d 1141, 1141-42 (Ala.Crim.App. 1989)(Judge Thomas did not override a jury's 8-4 recommendation for life imprisonment). Argo stated that he did not recall whether he was aware of Judge Thomas's record of overriding jury recommendations. (Volume 15 of Rule 32 hearing at p. 135.) Thus, counsel's achievement during the penalty phase before the jury did not complete the task required of counsel in representing Harris during the penalty phase of her capital-murder trial.
Harris's counsel decided to rely on residual doubt during the penalty phase. That is, counsel decided to maintain during the penalty phase that Harris was innocent. Here, as in Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), counsel portrayed the decision to forgo the investigation and the presentation of mitigating evidence as a strategic decision protected from a hindsight review. Harris's case is very similar to Wiggins. In Wiggins the United States Court of Appeals for the Fourth Circuit ruled that counsel knew enough about Wiggins's background from available records to make a "reasonable strategic decision to focus on [Wiggins's] direct responsibility" for the killing during the penalty phase of the trial. Wiggins, 539 U.S. at 519, 123 S.Ct. 2527. In rejecting the reasoning of the Fourth Circuit Court of Appeals, the United States Supreme Court held:
"[C]ounsel were not in a position to make a reasonable strategic choice as to whether to focus on Wiggins' direct responsibility, the sordid details of his life history, or both, because the investigation supporting their choice was unreasonable."
Wiggins, 539 U.S. at 536, 123 S.Ct. 2527. In Wiggins, the United States Supreme Court held that counsel was ineffective because counsel had failed to adequately investigate the petitioner's life and had failed to call expert witnesses to testify regarding Wiggins's background even though counsel possessed information that should have prompted them to do so.
Thus, a strategic decision that is based on an incomplete investigation may not be strategic or reasonable.
"`[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular *1120 investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'"
Wiggins, 539 U.S. 510, 521-22, 123 S.Ct. 2527 (quoting Strickland v. Washington, 466 U.S. at 690-91, 104 S.Ct. 2052 (emphasis added)).
"The United States Court of Appeals for the Eleventh Circuit has held that trial counsel's failure to investigate the possibility of mitigating evidence is, per se, deficient performance. See Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) (`our case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them'), cert. denied, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); see, also, Jackson v. Herring, 42 F.3d 1350, 1366-68 (11th Cir.) (`Although counsel need not "investigate every evidentiary lead," he must gather enough knowledge of the potential mitigation evidence to arrive at an "informed judgment" in making [the decision not to present such evidence]. . . . [A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.') (emphasis added; citations omitted), cert. dismissed, 515 U.S. 1189, 116 S.Ct. 38, 132 L.Ed.2d 919 (1995). Furthermore, trial counsel may be found ineffective for failing to present evidence of adjustment to incarceration, evidence of mental-health problems. . . . See Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that a capital defendant must be permitted at the penalty phase of his trial to introduce evidence of adjustment and good behavior while incarcerated); Horton v. Zant, supra (counsel found ineffective for not presenting evidence of adjustment to incarceration); Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991), cert. denied, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992) (counsel found ineffective for failing to introduce evidence that defendant had mental-health problems and a very low IQ and had suffered from various bouts of paranoia and depression);. . . . "
Ex parte Land, 775 So.2d 847, 853-54 (Ala.2000)(emphasis on "must" in original; other emphasis added). As reflected above, counsel decided to rely on only residual doubt and the character evidence presented during the guilt phase of the trial, without conducting a meaningful investigation into the existence of possible mitigating evidence. Because counsel's investigation was inadequate, counsel was unaware of the significant available mitigating evidence that could have been presented on behalf of Harris during the penalty phase of the trial.
Moreover, in addition to the information obtained from Harris and that contained in counsel's case files, the following evidence, which was presented at the Rule 32 hearing through the testimony of family, friends, and mental-health experts, was readily discoverable and available to be presented at the penalty phase as evidence mitigating a death sentence.
Willie J. McPherson, Harris's younger brother, testified at the hearing. He testified that because Harris was older than he, Harris had taken care of him when he was a child while their mother worked. She cooked and cleaned for the entire family, which included eight children. He testified that when Harris was 16 she married John Wesley Robinson ("Buddy"). Willie said that during Harris's four-year marriage to Robinson, she lived about one mile *1121 down the road from Willie and that Willie was often at Harris's house. Willie said that Robinson drank and that he hit Harris with his fist and hand and that on one occasion he had also hit Willie. Willie testified that fighting between Harris and Robinson was common and that Harris "got scars like black eyes and her lips and stuff swole up" from Robinson's hitting her. He gave similar testimony regarding Jesse Lee Hall, Harris's common-law husband of approximately 10 years. The circuit court allowed testimony that Hall had killed the woman he lived with after he and Harris has separated"chopped her up with an axe or something." (Volume 15 of Rule 32 hearing at p. 157.)
Willie testified that he also spent a good deal of time with Harris and Isaiah Harris, her third husband and the victim in this case. He recounted that Isaiah Harris drank and that he hit Harris. He said that Harris once summoned him for help at 2:00 a.m. because Isaiah Harris was beating her. On that occasion Isaiah Harris pulled his gun out in front of Harris and Harris's children. On that occasion, not being sure of Isaiah's intentions, everyone ran out of the house and went to Willie's house to spend the night. On another occasion Harris arrived at Willie's house with "her lips . . . swole up, and she had bruises on her forehead and everything." (Volume 15 of Rule 32 hearing at p. 159.) Harris told Willie that Isaiah had hit her with a frying pan.
Willie McPherson never talked to an investigator for the defense. He said no lawyer for Harris had ever contacted him. He said he tried to talk to the attorneys once when he took his mother to their office but they "ignored" him, like "what [he] had to say just wasn't important." (Volume 15 of Rule 32 hearing at pp. 163, 168-69.) He stated that he attended Harris's trial and would have testified as he did in at the Rule 32 hearing had he been asked to do so.
George McPherson, another of Harris's younger brothers, testified at the hearing on Harris's Rule 32 petition. He testified that Harris took care of the family after their older sister died. Harris washed, cooked, and ironed. The family did not have a washing machine so clothes were washed by hand in a washtub. There was no running water. Water was carried from a well located at their cousin's house a "good ways" away from their house. (Volume 15 of Rule 32 hearing at p. 193.) He testified that he saw John Wesley Robinson ("Buddy") "jumping on [Harris], beating her, stuff like that." (Volume 15 of Rule 32 hearing at p. 193.) He also testified that after he was grown, Harris bought his children Christmas presents when he did not have any money. He was not contacted by Harris's attorneys or an investigator, but he said he would have testified at trial if he had been asked to do so.
Barbara McPherson is Harris's younger sister. Harris took care of Barbara when they were growing up. She, too, testified that there was no running water or gas where they grew up. She said that when their daddy was shot, Harris and Jesse Lee Hall found his body. Barbara testified that when she was sick and could not take care of her four children, she and her children stayed with Harris. Harris also kept Barbara's children for two months when Barbara's baby was in the hospital. She also brought Barbara meals in the hospital in addition to taking care of the children and continuing to do her own job.
Barbara McPherson described Jesse Lee Hall as someone who drank, was "violent" and was a "woman-beater." (Volume 16 of Rule 32 hearing at p. 214.) She testified that she saw Hall beat Harris. Once she saw him pick up a posthole digger *1122 and swing it around with the intent to hit Harris on her head but Harris's father saw it in time and intervened. Once, after Harris had left Hall, Hall began begging her to return to him. She refused and he "jumped on her" and had to be pulled off by others present. (Volume 16 of Rule 32 hearing at p. 215.)
Barbara McPherson also knew Isaiah Harris. She described his attitude as "I enforce the law, but I ain't got to abide by the law." (Volume 16 of Rule 32 hearing at p. 216.) She testified that she had heard him say that very thing. Barbara stated that once Isaiah was drinking and driving in excess of the speed limit. Barbara said that she told him not to speed but he said "I'm the law. If they stop me, what they going to do?" (Volume 16 of Rule 32 hearing at p. 216.) Barbara said Isaiah was a different person when he drank.
Barbara McPherson never heard from defense counsel or an investigator, but she attended Harris's trial and would have testified at Harris's trial if she had been asked to do so.
Carolyn Rhodes is Harris's daughter. She was 19 years old at the time of the trial. She lived with her mother and Isaiah Harris. She testified that Harris and Isaiah Harris fought "a lot," usually about twice a week. (Volume 15 of Rule 32 hearing at p. 200.) She characterized the fights as "screaming, hitting on her, mostly he start on her and I also try to keep him from hitting her when she try to get out." (Volume 15 of Rule 32 hearing at p. 200.) She testified that Harris left Isaiah Harris once when he drew his gun on Harris and hit Harris on the head with a frying pan. Rhodes's uncle had to come and get them on that occasion. However, Harris went back to Isaiah Harris after that incident. Rhodes said her mother tried to move out a second time but Isaiah "laid in front of the car, then he went and laid behind the car" so she could not drive away. (Volume 16 of Rule 32 hearing at p. 201.) She said Isaiah Harris "drank every day." (Volume 16 of Rule 32 hearing at p. 201.)
Rhodes testified that there was a family meeting with Harris's lawyers one time but that the purpose of the meeting was to pay them. She never heard from them again or from an investigator. Rhodes stated that she attended the trial and that she would have testified at trial as she did at the Rule 32 hearing had she been asked to do so.
Jesse L. Robinson is Harris's son. He was 15 years old when she was arrested. He lived with Harris and Isaiah during their marriage. He testified that Harris and Isaiah fought "a lot." (Volume 16 of Rule 32 hearing at p. 222.) Once he saw Isaiah "pull a gun out and he shot in the floor." (Volume 16 of Rule 32 hearing at p. 222.) Once his uncle was taking Robinson home and when they arrived, everybody was outside the house because Isaiah had a gun out. Isaiah began waving it at Robinson and his brother so they had to leave with their uncle. Robinson said that one time Isaiah hit Harris with a frying pan and she had to go to the emergency room. (Volume 16 of Rule 32 hearing at p. 225.) Isaiah drank "anywhere from a twelve pack a day, maybe eighteen. And on special occasions, probably liquor, vodka, something like that." (Volume 16 of Rule 32 hearing at p. 223.) Robinson stated that when he was about 12 years old he ran away from home because he "tired of the fighting" between Harris and Isaiah and "there was nothing I could do about it." (Volume 16 of Rule 32 hearing at p. 223.)
Robinson described his mother as loving and caring but "also strict." (Volume 16 of Rule 32 hearing at p. 223.) She encouraged *1123 her children to "be the best at what you do." (Volume 16 of Rule 32 hearing at page 223.) She also attended Robinson's football and basketball games when he was young. Robinson was never contacted by an attorney or an investigator. He attended Harris's trial and he would have testified at Harris's trial if he had been asked to do so.
Stanley T. Robinson is Harris's son. He lived with Harris and Isaiah during their marriage. He testified that there was a lot of fighting between Harris and Isaiah. Robinson said he saw Isaiah "hit her, you know, cursing at her, getting real violent towards her." (Volume 16 of Rule 32 hearing at p. 231.) He remembers that one time Isaiah Harris pulled a gun on her. During these incidents, he heard Isaiah Harris say things to Harris such as "motherfucker" and say that he was going to "do things" to her and say to her "You're no good." (Volume 16 of Rule 32 hearing at p. 232.) These incidents happened "a number of times." (Volume 16 of Rule 32 hearing at p. 232.) Robinson testified that once Harris said she was going to leave and Isaiah "had a gun on her saying what he was going to do to her" if she did. (Volume 16 of Rule 32 hearing at p. 232.) One time Harris telephoned the police about Isaiah Harris's abuse but they "didn't do nothing" when they got to the house. (Volume 16 of Rule 32 hearing at p. 233.) Robinson guessed that Isaiah drank a 12 pack of beer every two days. He recalled one time that he was with Isaiah when he was drinking and driving too fast. He got stopped for speeding, but the officer let him go when Isaiah showed him his badge.
Robinson also knew Lorenzo McCarter, Harris's co-defendant. They worked together at one time. Robinson said that McCarter drank "a lot." (Volume 16 of Rule 32 hearing at p. 234.) McCarter drank at work beginning early in the morning. Robinson stated that McCarter was "a relaxed person" until he began drinking. When McCarter drank "he became kind of vicious-like, got an attitude, real snappy." (Volume 16 of Rule 32 hearing at p. 235.) Robinson described his mother as "a loving caring person . . . that would give you her life if she had it to give." (Volume 16 of Rule 32 hearing at p. 235.) Robinson recalled talking to a lawyer as a part of a family group, but not individually and he was not asked to testify at trial. He recalled being asked whether he knew "anybody that wanted to come or anything is all they ever asked me." (Volume 16 of Rule 32 hearing at p. 235.) Robinson did not talk to an investigator. He attended his mother's trial and would have testified if he had been asked to do so.
Helen Green is Harris's friend and has known Harris all her life. They grew up together. She remembered when Harris's older sister, Elizabeth, died. Harris had been close to her sister, and she grieved a lot when Elizabeth died. When Elizabeth died Harris became the oldest child and had to take care of the children because her parents worked. She also remembered when Louise's brother, James, died. Harris was present when they pulled his body from the water after he had drowned.
Green described Harris as a "dependable, reliable, a good friend. She's a person with a spirit to help anyone. You know, if she can help you, she will." (Volume 16 of Rule 32 hearing at p. 228.) Green testified that once when Green was down on her luck and having a hard time, Harris fed Green and her children. Green did testify at Harris's trial as a character witness stating that Harris had a good reputation in the community for truth and honesty. (Volume 4 of record on direct appeal at p. 701). Other than when someone telephoned *1124 her who said they wanted her to testify, she said that she spent "maybe five, ten minutes" with a lawyer before trial. Green was never asked about Harris's background or personality. No one asked Green to testify at sentencing but she said she would have if she had been asked.
Adrienne K. Ivey was food-services director for the First Baptist Church in Montgomery at the time of Isaiah Harris's murder. Harris was her employee for four years at the church and was in charge of the kitchen.[11] Ivey testified that there were "so many people at First Baptist Church that love [Harris] so." (Volume 15 of Rule 32 hearing at p. 172.) Ivey stated that Harris was a "very, very, hard worker"; "I was able to confide in [Harris]"; Harris got along with co-workers "great" because "they all respected [Harris] a lot because she knew her job." (Volume 15 of Rule 32 hearing at p. 173.) According to Ivey, Harris had "empathy for other people." Specifically Ivey recounted a young alcoholic whom Harris helped so he would not lose his job in the kitchen and how Harris helped Ivey when Ivey's mother died. Ivey stated that Harris "loved her children"; "was strict on her children"; and was "very protective of her children." (Volume 15 of Rule 32 hearing at p. 177.) She said that Harris was "very definitely" a good mother, "very much so." (Volume 15 of Rule 32 hearing at p. 177.)
Ivey said that some attorney telephoned her early one morning and asked her a couple of questions and said he would call her back but he never did. Ivey said that she was not contacted by an investigator. She stated that she did not attend Harris's trial but that she would have testified on Harris's behalf if she had been asked to do so and that "any of the girls in the [church] kitchen would have been happy to testify for [Harris]." (Volume 15 of Rule 32 hearing at p. 179.) Ivey went on to say:
"And I'm going to say again, I'm going to reiterate one more time about the fact that our staff, all of them, thought so much of Louise. I cannot emphasize that enough. Because she had been so good to all of them and been such a personable friend to so many people in the church. Any of them would have probably testified if they had been asked."
(Volume 15 of Rule 32 hearing at p. 179.)
Brenda Law was employed by the Elmore County Sheriff's Department as the administrator of the jail at the time Harris was incarcerated there. Upon her arrest, Harris was taken to the Elmore County jail. Law testified that she noticed bruises on Harris's legs at that time. According to Law, Harris became "a kitchen trusty and helped cook and stuff there." (Volume 16 of Rule 32 hearing at p. 208.) Harris was a "wonderful cook" and "everybody loved her food." (Volume 16 of Rule 32 hearing at p. 208.) She got along well with the other inmates; there were no problems "ever out of [Harris.]" (Volume 16 of Rule 32 hearing at p. 208.) Law testified: "Sometimes we had to watch other women, they were all on the same cell block like on a suicide block, or be kind of upset, sometimes we would put Louise in there to sort of help and just calm them down." (Volume 16 of Rule 32 hearing at p. 208.) Law said it was her opinion that Harris was "a very sweet lady, very dedicated to whatever she was doing." (Volume 16 of Rule 32 hearing at p. 208.) However, Law said that Harris was "withdrawn" and "didn't talk a lot about her personal life" "other than her kids." (Volume 16 of Rule 32 hearing at pp. 209, 212.) It was also Law's opinion *1125 "judging from other people that have been in the jail" that Harris "had been battered and assaulted." (Volume 16 of Rule 32 hearing at p. 209.) Law was not contacted by counsel or by an investigator, but she indicated that she would have testified at Harris's trial if she had been asked to do so.
In addition to the above testimony from family and friends, expert testimony was also presented at the Rule 32 hearing concerning Harris's family and life history.
Dr. Martha T. Loring is a clinical social worker specializing in battered woman's syndrome[12] and post-traumatic stress disorder ("PTSD"),[13] and is director of the Center for Mental Health and Human Development in Atlanta, Georgia. Dr. Loring is a "Board Certified Expert in Traumatic Stress with a Diplomate in the American Academy of Experts in Traumatic Stress." (Rule 32 hearing, vol. 16, p. 240.) She spent 30 hours examining Harris. She also personally interviewed numerous individuals, including Harris's family and friends and reviewed various written documents concerning Harris. Dr. Loring concluded after this lengthy evaluation that Harris suffered from PTSD and battered women's syndrome at the time of the murder.
Dr. Loring observed several symptoms of PTSD in Harris. She testified that one symptom of PTSD that Harris displayed was the characteristic of avoidance: Harris tried to avoid traumatic memories and found it difficult to talk about them and about her feelings about them. She suffered from dissociation; she had difficulty thinking and experienced a sense of panic. She suffered "flashbacks, intrusive thoughts and numbing, where sometimes her feelings aren't available to her, because they are so painful and she tries to avoid them." (Rule 32 hearing, vol. 16, p. 257.) According to Dr. Loring, as symptoms of battered woman syndrome, Harris tried to appease the men who abused her and she exhibited learned helplessness. She displayed an ongoing fear, which caused her to shake and occasionally cry as she discussed incidents, and Harris tried to minimize the traumatic events she had gone through. When pushed hard to remember incidents, Harris would "flail about and try to protect herself . . . [with] movements of [her] hands or arms [as if] trying to protect herself of being choked or being shot, or being hit." (Rule 32 hearing, vol. 16, p. 264.)
Dr. Robert D. Shaffer, an expert clinical psychologist, performed a dissociative experiences survey ("DES")[14] on Harris and found that her score of between 30-40 was *1126 within "a range typical of most individuals who have [DES]." (Rule 32 Record vol. 16, p. 328.) Shaffer explained that the "general population obtains a score around five." (Rule 32 Record vol. 16, p. 328.) Dr. Shaffer continued that "[t]his score was in a range typically higher than that obtained by most individuals with Post-Traumatic Stress Disorder, and revealed a more severe level of dissociation typical of people with Post-Traumatic Stress Disorder." (Rule 32 Record vol. 16, p. 328.) Dr. Shaffer stated that DES "is what [he] would consider to be an extension of Post-Traumatic Stress Disorder, or an exacerbated condition of Post-Traumatic Stress Disorder, where over the years, a person splits off from their awareness of reality in order to cope." (Rule 32 Record vol. 16, pp. 335-36.)
Dr. Shaffer also performed a "Structured Interview of Reported Symptoms," which is a test designed to detect "faking and malingering of symptoms." (Rule 32 Record vol. 16, p. 331.) According to Shaffer, known malingerers score on average 80. The average honest population scores 25. Harris scored 11, indicating "that she was much less likely to endorse symptoms, much less likely to report difficulties in problems than the average honest responder." (Rule 32 Record vol. 16, p. 332.) Moreover, according to Dr. Shaffer the test revealed that Harris "tends to deny or minimize everyday problems. She tends to look at the world with a sunny side up, so to speak, and present herself as composed and competent and capable, rather than having any problems." (Rule 32 Record vol. 16, pp. 332-33.)
Dr. Shaffer also conducted an intelligence quotient ("IQ") test on Harris and found her full scale IQ to be 79, "which is in the borderline range [between normal and retarded] of IQ." (Rule 32 Record vol. 16, p. 333.)
Dr. Karl Kirkland, a witness called by the State, is an expert in forensic psychology. He spent three to four hours with Harris and reviewed documents relevant to her and reviewed literature on battered-woman syndrome in preparation for his testimony. He determined through tests that Harris read at a fifth-grade level. As a result of his evaluation, Kirkland disagreed with the conclusions of Dr. Loring and Dr. Shaffer regarding their respective diagnoses that Harris suffered from battered-woman syndrome, DES and PTSD. However, Dr. Kirkland stated: "Certainly, Ms. Harris meets plenty of diagnostic criteria to be called a battered woman. She has had a very difficult, horrendous life. There's no question about that. She has been in numerous battering relationships. In that sense, she meets the criteria to be called a battered woman." (Rule 32 Record, vol. 17, p. 401. Emphasis added.) It was Dr. Kirkland's opinion that Harris's "personality strengths" or "strength as an individual" prevented her from developing battered woman syndrome, DES, or PTSD. Dr. Kirkland noted that "[Harris] is clearly a very well-liked person" and commented that the prison warden and several guards dropped by just to speak with her during his interview. (Rule 32 Record, vol. 17, p. 406.)
"`"An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence."'" Wood v. State, 891 So.2d 398, 415 (Ala.Crim.App.2004)(opinion on return to remand), (quoting Daniels v. State, 650 So.2d 544, 569 (Ala.Crim.App.1994), quoting in turn Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir.1988)). Here a reasonable investigation would have disclosed substantial evidence that could have been presented in mitigation. However, because counsel did not investigate the existence *1127 of mitigating evidence, their decision to rely only on residual doubt, character evidence presented during the trial, and the pre-sentence report was not reasonable. Because counsel failed to investigate, there was essentially nothing for the trial court to weigh in mitigation against the one aggravating circumstance that tipped the scales in favor of imposing a death sentence.
"[O]ur principal concern in deciding whether [counsel] exercised `reasonable professional judgmen[t],' [Strickland, 466 U.S. at 691], is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was itself reasonable. Ibid. Cf. Williams v. Taylor, [529 U.S. 362] at 415 [(2000)] (O'Connor, J., concurring) (noting counsel's duty to conduct the `requisite, diligent' investigation into his client's background). In assessing counsel's investigation, we must conduct an objective review of their performance, measured for `reasonableness under prevailing professional norms,' Strickland, 466 U.S., at 688, which includes a context-dependent consideration of the challenged conduct as seen `from counsel's perspective at the time,' id., at 689 (`[E]very effort [must] be made to eliminate the distorting effects of hindsight')."
Wiggins, 539 U.S. at 522-23, 123 S.Ct. 2527 (some emphasis original; some emphasis added).
As the United States Supreme Court explained in Wiggins, the value of counsel's "strategic" decision depends on "the adequacy of the investigations supporting [that] judgment[ ]." Wiggins, 539 U.S. at 521, 123 S.Ct. 2527.
"Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)standards to which we long have referred as `guides to determining what is reasonable.' Strickland, supra, at 688; Williams v. Taylor, supra, at 396. The ABA Guidelines provide that investigations into mitigating evidence `should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. id., 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (`The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. . . . Investigation is essential to fulfillment of these functions')."
Wiggins, 539 U.S. at 524-25, 123 S.Ct. 2527.
Here, the record reveals that before the penalty phase of the trial counsel had before them documents, notations, information from family and friends that, if pursued, would have led to the discovery of statutory and nonstatutory mitigating evidence. In summary, it was disclosed at the hearing on the Rule 32, Ala. R.Crim. *1128 P., petition that the following facts were readily discoverable for presentation as mitigating evidence:
1. Harris's childhood was spent in extreme poverty as the oldest (following the death of her older sibling) of eight children.
2. At age 10 or 11 Harris was raped. (Volume 15 of Rule 32 hearing at p. 110.)
3. When Harris was 14 years old, her older sister suffered a seizure and died in Harris's arms.
4. When Harris was 14 years old, her house burned down two days after Christmas. (Volume 15 of Rule 32 hearing at p. 106.)
5. When Harris was approximately 14 years old, her younger brother drowned and she witnessed authorities pull his body from the water.
6. Harris married at age 16, and between the ages of 16 and 19 she was abused by husband, John Wesley "Buddy" Robinsoneven during Harris's pregnancies.
7. Between the ages of 19-27, Harris was abused by her boyfriend, Jesse Lee "Kingsize" Hall. (In 1984 Jesse Lee Hall was incarcerated for the beating death of his then wife, Annie Bledsoe. (Rule 32 Record vol. 18, p. 75.))
8. At approximately age 21, Harris discovered the body of her murdered father and harbors concern that he was murdered by Jesse Lee "Kingsize" Hall.
9. At ages 31-34, Harris was physically abused by her second husband, Deputy Sheriff Isaiah Harris (the victim) who suggested to her that she could do nothing to stop him from abusing her because he was a deputy sheriff.
10. At age 34, Harris was physically abused by her lover, Lorenzo "Bobo" McCarter, who is also a co-defendant in the instant case.
11. In spite of her own hardships, Harris was a good person and helped others in need.
12. Harris may suffer from battered-woman syndrome and PTSD, but at the very least, has suffered harsh experiences throughout her life that contribute to these conditions.
13. Harris's IQ is 79, which is in the borderline range between normal and retarded.
14. Harris had successfully acclimated herself to prison life.
Here, counsel had before them many clues suggesting that Harris's troubled past, yet they declined to investigate those clues for possible use in the penalty phase. Instead, counsel relied on only the sparse testimony of character witnesses,[15] who, while adequately painting a picture of Harris as an affable, hard working, Christian woman, completely failed to offer any insight into Harris's psyche or the very difficult life Harris had experienced and particularly in her relationship with Isaiah Harris. As the Federal District Court found in Wiggins, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." Wiggins, 539 U.S. at 525, 123 S.Ct. 2527 (citing Wiggins v. Corcoran, 164 F.Supp.2d 538, 559 (D.Md.2001)). By their course of action, counsel hoped to promote the jury's "residual doubt" as to Harris's guilt. Counsel argues that their strategy was effective because the jury *1129 recommended by a vote of 7-5 a sentence of life imprisonment without parole. Counsel's alleged strategy overlooked the trial court's opportunity during the second part of the penalty phase to override the jury's recommendation.
Moreover, despite their initial success in the penalty phase before the jury, counsel's strategy was flawed from its conception.
"`"`"[R]esidual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. [citations omitted.] "Residual doubt" is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty."'"'"
Melson v. State, 775 So.2d 857, 899 (Ala.Crim.App.1999)(quoting Myers v. State, 699 So.2d 1281, 1283-84 (Ala.Crim. App.1996), aff'd, 699 So.2d 1285 (Ala.1997), quoting in turn Harris v. State, 632 So.2d 503, 535 (Ala.Crim.App.1992), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), quoting in turn Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)).
Harris has affirmatively shown, through testimony and documents presented at her Rule 32 hearing, that there was a wealth of mitigating evidence readily available to counsel that counsel should have investigated before it can be said that counsel's strategy for the penalty phase was a reasonable strategic choice. In other words, counsel made their decision while uninformed as to "the overall character" of potential witnesses testimony. See Blake v. Kemp, 758 F.2d 523, 535 (11th Cir.1985). Thus, counsel's alleged defense strategy for the penalty phaseto not investigate for evidence in mitigation but to rely on "residual doubt" as to guiltwas from its conception, deficient performance.
Because we find counsel's performance to be deficient, we must determine whether the deficient performance caused Harris to suffer prejudice.

Prejudice to Harris
"`"[I]n a challenge to the imposition of a death sentence, the prejudice prong of the Strickland inquiry focuses on whether `the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."'"
Wood v. State, 891 So.2d 398, 414 (Ala.Crim.App.2003)(opinion on return to remand) (quoting Daniels v. State, 650 So.2d 544, 568-70 (Ala.Crim.App.1994), quoting in turn Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992)).
The only aggravating factor in this case was that the murder was committed for pecuniary gain. § 13A-5-49(6), Ala.Code 1975. The only statutory mitigating factor presented to the jury was that Harris did not have a criminal record. § 13A-5-51(1), Ala.Code 1975. The only nonstatutory mitigating evidence presented to the jury during the penalty phase was the adoption of the character evidence presented during the guilt phasethat Harris attended church, that she worked hard, and that she had a reputation for good character among those who knew her. See § 13A-5-52, Ala.Code 1975. The only mitigating evidence presented to the trial judge during the penalty phase was the testimony and presentence report of Probation Officer Edward G. Fawbush, who recommended Harris be sentenced to life imprisonment without parole. However, the State elicited testimony from Fawbush *1130 that questioned the soundness of his recommendation.[16]
During the penalty phase the State portrayed Harris as a calculating, devious woman who suffered from no emotional distress and who was not a battered woman. (Direct Appeal Record vol. 6, pp. 1002, 1004, 1033). Specifically, during the penalty phase in front of the jury the prosecutor argued: "Did [Harris] act under duress or domination of another? No. She was living safe at home with a lawman at her side protecting her." (Volume 15 of Rule 32 hearing at p. 133, quoting volume 6, p. 1004 of direct appeal.) During the penalty phase in front of the jury the prosecutor argued: "What evidence is there of this mental or emotional distress or disturbance? Absolutely none." (Direct Appeal Record vol. 6, p. 1003). During the penalty phase before the trial judge, the prosecutor argued: "There is no duress or domination. . . . Also, this is a premeditated crime, unlike a battered woman responding that evening. . . ." (Direct Appeal Record vol. 6, p. 1033). Those comments went unchallenged.
The trial court found the following in its sentencing order:
"`In weighing the aggravating and mitigating circumstances, the Court is aware of the nature of the process as defined in Section 13A-5-48. It is not a matter the Court takes lightly. After carefully considering the matter, the Court is convinced that the one statutory aggravating circumstance found and considered far outweighs all of the non-statutory mitigating circumstances, and that the sentence ought to be death.'"
Harris v. State, 632 So.2d at 542 (emphasis added).
Harris's IQ of 79 is considered to be on the borderline between normal and retarded. Also, according to Dr. Kirkland, a State witness, Harris's mental condition met "plenty" of the criteria for her to be classified as a battered woman. (Rule 32 Record, vol. 17, p. 401.) Additionally, there was evidence from family and friends supporting what Dr. Kirkland termed as Harris's "very difficult, horrendous life." (Rule 32 Record, vol. 17, p. 401.) Both the jury and the trial court could have found this evidence to be mitigating had it been presented during the penalty phase. Thus, in order to establish the nature of Harris's difficult and horrendous life, as well as the nature of her mental condition before the judge and jury, evidence of her lifelong hardships and abuse was particularly important as mitigating evidence that should have been presented at the penalty phase. This is especially true given the trial judge's history for overriding jury verdicts where less than eight jurors voted for life imprisonment without parole.
Had the mitigating evidence discussed in this opinion been presented, it is possible that the trial court could have found two additional statutory mitigating factors: that "[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," § 13A-5-51(2), Ala.Code 1975 and that "[t]he defendant acted under extreme duress or under the substantial domination of another person," § 13A-5-51(5), Ala.Code 1975. It is possible that the trial court could have found as non-statutory mitigating factors that Harris that had a traumatic childhood and that she adjusted well to prison life.
In Baxter v. Thomas, 45 F.3d 1501, 1515 (11th Cir.1995), the United States Court of Appeals for the Eleventh Circuit stated:

*1131 "While deficient performance in investigating psychiatric mitigating evidence will not always prejudice the defense, the factors suggesting prejudice in this case are strong. First, only one aggravating circumstance was present: that the crime was committed for the purpose of monetary gain. It is therefore likely that testimony of Baxter's mental retardation and psychiatric history as mitigating evidence would have caused the jury to impose a life sentence in lieu of the death penalty."
In Blake v. Kemp, 758 F.2d 523 (11th Cir.1985), defense counsel "made no preparations whatsoever for the penalty phase" thinking that Blake would be found not guilty. Here, as in Blake, defense counsel's
"failure to seek out and prepare any witnesses to testify as to mitigating circumstances . . . deprived him of . . . an opportunity [to put on mitigating evidence]. This was not simply the result of a tactical decision not to utilize mitigation witnesses once counsel was aware of the overall character of their testimony. Instead, it was the result of a complete failurealbeit prompted by a good faith expectation of a favorable verdictto prepare for perhaps the most critical stage of the proceedings. We thus believe that the probability that Blake would have received a lesser sentence but for his counsel's error is sufficient to undermine our confidence in the outcome."
Blake v. Kemp, 758 F.2d at 535.
Here, counsel obtained from the jury seven votes for life imprisonment without parole without presenting any significant mitigating evidence. "Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading jurors that the life of a capital defendant is worth saving." Allen v. Woodford, 366 F.3d 823, 844 (9th Cir.2004). As in Baxter v. Thomas, supra, the only aggravating circumstance in Harris's case was that the crime was committed for the purpose of monetary gain. The Baxter Court found counsel's failure to investigate Baxter's mental retardation and psychiatric history as mitigating evidence to be deficient performance and prejudicial. The Baxter Court found that it was "likely that testimony of Baxter's mental retardation and psychiatric history as mitigating evidence would have caused the jury to impose a life sentence in lieu of the death penalty." Baxter v. Thomas, 45 F.3d at 1515. In Harris's case, had the jury been afforded the opportunity to consider evidence of Harris's low IQ and strength of character, together with evidence of her "horrendous" life and her successful acclimation to prison life as mitigating evidence, it is probable that additional jurors would have voted for life imprisonment without parole and that Judge Thomas would not have overridden the jury's a recommendation of life imprisonment without the possibility of parole. Counsel's failed memories concerning discussions about evidence to be presented at the penalty phase suggests that no alternatives where considered before counsel adopted the defense chosen for the penalty phase. No investigation was conducted into possible mitigating evidence because of counsel's ill-advised decision to rely on residual doubt during the penalty phase.
Thus, there is a reasonable probability that had counsel conducted a reasonable investigation into possible mitigating evidence, the balance between the aggravating circumstance and the mitigating circumstances would have tipped further in favor of a sentence of life imprisonment without the possibility of parole. Thus, the outcome of Harris's penalty phase *1132 would have been different, but for trial counsel's performance. Therefore, Harris's counsel were ineffective at the penalty phase of the trial.
We reverse the circuit court's order as to sentencing and remand this cause to the circuit court for a new penalty-phase hearing before a jury and then an additional hearing before the trial judge.
Our resolution of this issue obviates the need to discuss the other issues raised by Harris asserting error during the penalty phase or concerning electrocution as punishment.[17]

IV.
Harris contends that the circuit court abused its discretion by refusing to consider the testimony presented by Stephen Glassroth, a criminal defense attorney who testified as an expert at the Rule 32 hearing on behalf of Harris.[18] The trial court stated in footnote 1 of its order denying the Rule 32, Ala. R.Crim. P., petition that "the Court did not consider the testimony of Stephen Glassroth due to his failure to consider any direct evidence from trial counsel and, perhaps more importantly, the reasons he gave for not doing so." (Rule 32 Record vol. 9, p. 1697.) Glassroth testified that he did not think it was necessary to speak with trial counsel because "I believe that they would have some explanation trying to . . . either explain away their failures or justify what they did." (Rule 32 Record vol. 16, p. 378.)
Harris argues the following regarding Glassroth's testimony.
"Mr. Glassroth testified that trial counsel failed: to spend enough time with Harris . . .; to interview sufficiently Harris's family members, friends and associates . . .; to obtain necessary records . . .; to follow existing leads . . .; and to investigate mental health issues. . . . He testified also that counsel failed to present sufficient evidence in the penalty and sentencing phases, which prejudiced Harris's defense. . . . As a result, he testified, trial counsel's performance was objectively unreasonable and deficient."
(Harris's brief at p. 75.)
Because Harris did not raise this issue in the circuit court by way of post-trial motion, it is deemed waived from appellate review. See Whitehead v. State, 593 So.2d 126 (Ala.Crim.App.1991).
Moreover, if the circuit court's refusal to consider Glassroth's testimony was error, it was harmless error. As to the guilt phase, we note that the record is replete with testimony pointing out that Harris unequivocally maintained her innocence and pursued a theory of defense consistent with that position. "`There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" DeBruce v. State, 890 So.2d at 1081 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052.) Here, defense counsel pursued a defense consistent with the account of the facts presented to them by Harris. "Defense *1133 counsel made a reasoned, strategic decision not to argue inconsistent, alternative theories of defense"such as that Harris was completely innocent and alternatively that Harris suffered from battered women's syndrome. Johnson v. State, 612 So.2d 1288, 1296 (Ala.Crim.App. 1992). "[D]efense counsel's reasoned, strategic decision was not outside `the wide range of reasonable professional assistance.'" Johnson v. State, 612 So.2d at 1297 (quoting Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. 2052). Because that theory proved unsuccessful does not mean that Glassroth's opinions are conclusive and establish the requirements of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`Even if counsel committed what appears in retrospect to have been a tactical error, that does not automatically mean that petitioner did not receive an adequate defense in the context of the constitutional right to counsel.' Ex parte Lawley, 512 So.2d 1370 (Ala.1987). `"An accused is not entitled to error-free counsel."' Stringfellow [v. State], 485 So.2d [1238] at 1243 [(Ala.Crim.App.1986) ]."
Hutchins v. State, 568 So.2d 395, 397 (Ala. Crim.App.1990).
As to the penalty phase, for the reasons's set forth in Part III, above, we found counsel's performance to have been deficient and to have resulted in prejudice during the penalty phase and are remanding this cause for new sentencing hearing.

V.
Harris claims that the circuit court abused its discretion by refusing to consider evidence in Harris's "Motion to Supplement the Record." Because Harris did not raise this issue in the circuit court, it is deemed waived. See Whitehead v. State, 593 So.2d 126 (Ala.Crim.App.1991).

VI.
Harris contends that the circuit erred in summarily dismissing numerous claims raised in her original petition.
The circuit court correctly ruled that the following claims were procedurally barred pursuant to Rule 32.2(a)(4), Ala. R.Crim. P., because they were addressed on appeal:
1. The trial court erred by removing trial counsel for seeking reasonable compensation.
2. The trial court erred by denying trial counsel's motion for compensation.
3. The trial court erred by excluding Harris from critical proceedings.
4. The trial court erred by failing to transcribe all trial court proceedings.
5. The trial court erred by failing to grant Harris's challenge for cause against veniremember [A.C.]
6. The trial court erred by failing to grant a change of venue.
7. The trial court erred by limiting cross-examination of Messrs. Trimble and Patterson.
8. The state engaged in numerous instances of unconstitutional misconduct.
9. The evidence was insufficient to sustain a conviction of capital murder.
10. Harris's conviction and sentence were improperly obtained on the basis of Mr. Harris's characteristics.
11. The trial court erred by admitting highly prejudicial photographs of Mr. Harris.
12. The trial court erred by inadequately instructing the jury.
Harris also claims that the trial court erred in improperly correcting its sentencing order. This claim is procedurally barred because it was raised at trial and could have been raised on appeal, but *1134 was not. Rules 32.2(a)(2) and (3), Ala. R.Crim. P.
For the foregoing reasons, the circuit court's denial of Harris's postconviction claims seeking relief based on alleged errors committed during the guilt phase is affirmed. However, the circuit court's denial of relief regarding the penalty phase is reversed for the reasons set forth in Part III. Thus, the cause is remanded to the circuit court for a new penalty-phase proceeding before a jury and then a judge, in accordance with §§ 13A-5-46 and 13A-5-47, Ala.Code 1975.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
McMILLAN, P.J., concurs; COBB, J., concurs in part and dissents in part, with opinion, which SHAW, J., joins; WISE, J., concurs in part and dissents in part, with opinion; BASCHAB, J., concurs in the result, with opinion.
COBB, Judge, concurring in part and dissenting in part.
This is an appeal from the denial of a Rule 32, Ala. R.Crim. P., petition alleging, among other things, that trial counsel rendered ineffective assistance. I agree with the result reached in the main opinion affirming as to Harris's guilt-phase issues and reversing as to the penalty-phase issue and remanding the case for a new sentencing hearing before a jury. However, for the reasons stated in my special writing in Taylor v. State, [Ms. CR-02-0706, August 27, 2004] ___ So.2d ___ (Ala.Crim.App. 2004)(Cobb, J., concurring in part and dissenting in part), I dissent from the rationale in the affirmance of guilt-phase issues in the following parts of the opinion: II.A.7.f.1., II.A.7.f.4., II.A.7.f.5., II.A.7.f.6., II.A.7.f.7., II.A.7.f.8., II.A.7.f.9., II.A.7.g.1., to the extent the main opinion affirms the circuit court's denial of these claims based on this Court's plain-error review of the underlying substantive claims on direct appeal. I would not deny an ineffective-assistance-of-counsel claim based only on this Court's previous plain-error review of the underlying substantive issues on direct appeal.
For the foregoing reasons, I concur in part and dissent in part from the main opinion.
WISE, Judge, concurring in part and dissenting in part.
I concur with Part I of the main opinion affirming the circuit court's denial of relief on Harris's Batson claim based on procedural bars. I also concur with Part II of the main opinion affirming the circuit court's denial of relief on Harris's claim of ineffective assistance of counsel during the guilt phase of her trial. However, I dissent from Part III of the main opinion reversing the circuit court's order insofar as it denies relief on Harris's claim of ineffective assistance of counsel during the penalty phase of her trial.
To prevail on a claim of ineffective assistance of counsel, a defendant must establish (1) that his counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987). "The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under `prevailing professional norms,' was `reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala.Crim.App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would *1135 have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. 2052.
As the main opinion acknowledges, based on Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), "the `principal concern in deciding whether [counsel] exercised [the] "reasonable professional judgmen[t],"' required by Strickland, is `whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was itself reasonable.'" 947 So.2d at 1113. However, even assuming that counsel's decision regarding the presentation of mitigation evidence rendered their performance deficient, I believe that Harris failed to prove that the outcome would have been different had that evidence been introduced; namely, that the circuit court would have elected not to override the jury's recommendation that she be sentenced to life imprisonment without the possibility of parole and sentence her to death.
Harris's claim of ineffective assistance of counsel during the penalty phase primarily involved trial counsel's failure to present mitigating evidence of (1) her mental health; (2) the alleged abuse she suffered at the hands of her husbandthe victim; and (3) her difficult childhood and traumatic life. With regard to these issues, I do not disagree that many aspects of Harris's life were tragic.
The main opinion appears to place importance on the fact that the sentencing judge was less inclined to override a jury's recommendation of life imprisonment without parole in cases where at least eight jurors had voted for life imprisonment, citing Wagner v. State, 555 So.2d 1141 (Ala.Crim.App.1989). However, given the facts of this case, I do not believe that that fact alone would have changed the sentencing judge's decision in this case. In Wagner, the defendant had been convicted of capital murder based on burglary-homicide. By contrast, this case involved Harris's murder of her husbanda law-enforcement officerfor pecuniary gain. At the time of the victim's death, Harris was engaged in an extramarital affair with the man who would become one of her codefendants. Further, Harris asked her lover to hire someone to kill her husband, a jailer employed by the Montgomery County Sheriff's Department. Harristhe beneficiary of various insurance policies on the victim's lifestood to profit from her husband's death.
This Court, in reviewing Harris's conviction and sentence on direct appeal, addressed the propriety of Harris's death sentence. We noted that the sentencing judge properly found the existence of one aggravating circumstancethat the murder was committed for pecuniary gain and one mitigating circumstancethat the defendant had no criminal history. Harris, 632 So.2d at 542. We held that the sentencing judge correctly rejected the existence of the mitigating circumstance that Harris's participation in the offense was relatively minor. Id. This Court also quoted at length from the sentencing judge's discussion of the nonstatutory mitigating circumstances, including the following:
"`The defendant had family and friends who cared about her and had relationships with her which were beneficial to them and her. She was a hard working and respected member of the community. She was a steady worker in her church and community. She was *1136 held in high regard by her employers and friends.'"
632 So.2d at 542.
Clearly, there was ample evidence of mitigation before the sentencing judge to justify a sentence of life imprisonment without parole. While the use of a defendant's personal history, i.e., mental health, traumatic childhood, and history of spousal abuse, is more readily accepted today as evidence mitigating a defendant's criminal conduct, it should be noted that Harris was tried and convicted of this offense in 1989. At that time, the use of this kind of evidence was considerably less common and far less accepted. As we have previously noted, this Court should avoid using "hindsight" to evaluate counsel's performance. Hallford v. State, 629 So.2d 6, 9 (Ala.Crim.App.1992); Cartwright v. State, 645 So.2d 326 (Ala.Crim.App.1994). Because I do not believe that presentation of the aforementioned mitigation evidence would have changed the sentencing judge's decision to override the jury's advisory verdict of life imprisonment and sentence Harris to death, I must respectfully dissent from Part III of the main opinion.
BASCHAB, Judge, concurring in the result.
Although I do not agree with all of the language or reasoning in the main opinion, I do agree with the result. In making this decision, I am cognizant that "[t]here has never been a case where additional witnesses could not have been called," State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App. 1993); that "counsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence," Williams v. State, 783 So.2d 108, 117 (Ala.Crim.App.2000); and that "`counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.' Stanley v. Zant, 697 F.2d 955, 965 (11th Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)." Lundy v. State, 568 So.2d 399, 403 (Ala.Crim. App.1990). However, in this case, it does not appear that counsel conducted a sufficient investigation into the appellant's background to make an informed decision about what mitigating evidence to present. Also, additional mitigating evidence could have made a difference with regard to the jury's sentence recommendation and the trial court's decision with regard to overriding or accepting the jury's recommendation. Accordingly, I respectfully concur in the result.

On Applications for Rehearing
PER CURIAM.
The State of Alabama and Louise Harris have filed applications for rehearing from our decision of October 29, 2004, which applications we are overruling. We write solely for the purpose of responding to certain claims that this Court on original submission erred in reaching its decision and to acknowledge the Alabama Supreme Court's opinion in Ex parte Jenkins, [Ms. 1031313, April 8, 2005] ___ So.2d ___ (Ala.2005), which overrules our application of the relation-back doctrine on original submission.
On October 29, 2004, this Court released a per curiam opinion affirming Louise Harris's conviction for murder made capital because it was committed for pecuniary or other valuable consideration or pursuant to a contract or for hire, see § 13A-5-40(a)(7), Ala.Code 1975, but we remanded the case for a new penalty-phase proceeding before a jury and then a judge, in accordance with §§ 13A-5-46 and 13A-5-47, Ala.Code 1975. Presiding Judge McMillan concurred; Judge Cobb concurred in the result in part and dissented in part, with an opinion; Judge Baschab *1137 concurred in the result, with opinion; Judge Shaw concurred in part and dissented in part and joined Judge Cobb's special writing; and Judge Wise concurred in part and dissented in part, with opinion. The State has filed an application for rehearing asking this Court to reconsider its ruling reversing the sentence and remanding the case for a new penalty phase and Harris has filed an application for a rehearing asking this Court to reconsider its affirmance of the conviction.
On application for rehearing, the State has essentially presented the same arguments it presented in its brief on original submission. However, the State asserts that we "ignore[ed] clearly established federal precedent, not to mention an opinion of this Court itself released just a few months before releasing this opinion, holding that residual doubt is one of the most effective (and in this case successful) strategies a defense lawyer can pursue during a capital sentencing." (State's brief on application for rehearing at p. 26.) The State quotes as follows from Jenkins v. State, [Ms. CR-97-0864, February 27, 2004] ___ So.2d (Ala.Crim.App.2004):
"`A lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase. Creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty. We have written about it. See, e.g., Stewart v. Dugger, 877 F.2d 851, 855-56 (11th Cir.1989). In addition, a comprehensive study on the opinions of jurors in capital cases concluded:
"`"Residual doubt" over the defendant's guilt is the most powerful "mitigating" fact.[The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.'
"`Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Colum.L.Rev. 1538, 1563 (1998) (footnotes omitted); see William S. Geimer & Jonathan Amsterdam, Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases, 15 Am.J.Crim.L. 1, 28 (1988) ("[t]he existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied."); see also Jennifer Treadway, Note, "Residual Doubt" in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor, 43 Case W.Res.L.Rev. 215 (1992). Furthermore, the American Law Institute, in a proposed model penal code, similarly recognized the importance of residual doubt in sentencing by including residual doubt as a mitigating circumstance. So, the efforts of Tarver's lawyer, during trial and sentencing, to create doubt about Tarver's guilt may not only have represented an adequate performance, but evidenced the most effective performance in defense to the death penalty.'"
Jenkins v. State, ___ So.2d at ___ (quoting Tarver v. Hopper, 169 F.3d 710, 715-16 (11th Cir.1999)).
There is no conflict between the instant case and Jenkins. Jenkins acknowledges that residual doubt is not a mitigating factor. Jenkins states "[The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking." ___ So.2d ___ at (quoting Tarver, 169 F.3d at 715, quoting in turn Stephen P. Garvey, Aggravation and Mitigation *1138 in Capital Cases: What do Jurors Think? 98 Colum. L.Rev. 1538, 1563 (1998))(emphasis added.) Moreover, Jennifer Treadway, Note, "Residual Doubt" in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor, 43 Case W. Res. L.Rev. 215, 216 (1992), states that its purpose "is to advocate the use of residual doubt in capital sentencing." The note further acknowledges that the United States Supreme Court "has never recognized an Eighth Amendment right to argue this issue, leaving the decision regarding the admission of a residual doubt argument to state determination." 43 Case W. Res.L.Rev. at 216. Moreover, this Court's found reversible error on original submission not because the defense relied on residual doubt during the penalty phase, but because the defense relied on residual doubt without conducting a reasonable investigation into possible mitigating evidence before making its decision.
We have reviewed the other issues presented in the State's application for rehearing, and we conclude that the original opinion sufficiently addressed those issues. Based on the foregoing, the State's application for rehearing is overruled.
On application for rehearing, Harris asserts that we incorrectly decided many of the guilt-phase issues. We have examined that contention and in this opinion, we address one argument made on application for rehearing, but we do not change the result we initially reached.
Harris contends that in Parts IV and V of the opinion on original submission we "erroneously invoke[d] the case of Whitehead v. State, 593 So.2d 126 (Ala. Crim.App.1991), to hold that Mrs. Harris has `waived' two claims from appellate reviewthe circuit court's refusal to consider the testimony of expert witness Stephen Glassroth and the evidence presented in her Motion to Supplement the Record because the claims were not raised before the circuit court after that court made its ruling." (Harris's brief on application for rehearing at p. 23.) Assuming without determining that our reliance on Whitehead was misplaced, the outcome remains unchanged. Absent the procedural bar taken from Whitehead, Part IV of the main opinion set forth an alternative reason why Glassroth's testimony was insufficient to support a finding of ineffective assistance of counsel, and we are not persuaded by Harris's additional argument that that reasoning was incorrect. Thus, we decline at this time to consider Harris's argument concerning Whitehead, and we decline to change the result we initially reached as to Part IV.
As to Part V, we issued no alternative finding in Part V. However, some three months after the hearing on the petition Harris submitted several exhibits as attachments to the affidavits of Stuart W. Gold, counsel for Harris in her Rule 32, Ala. R.Crim. P., proceeding. In footnote 89 to Harris's petition, she states the following regarding those exhibits:
"Exhibits 1 and 2 (case action summaries of cases in which Judge Thomas overrode a jury recommendation of life without parole) were relevant to show that failure to secure additional votes increased the likelihood that Judge Thomas would override the jury's recommendation. . . . Exhibits 3 and 4 (articles and news transcripts concerning the extensive pre-trial news coverage of Mrs. Harris's case) were relevant to support her claims that trial counsel were ineffective in pursuing their motion to change venue. . . . Exhibits 25, 26, and 29 (Mr. McCarter's criminal record and plea agreement and Mr. Trimble's case action summary) were relevant to Mrs. Harris's claim that Messrs. Trimble *1139 and McCarter were ineffectively cross-examined and to the State's misleading closing argument."
(Harris's brief on appeal n. 89 at pp. 77-78.)
Though the documents were not considered by the trial court, the content of the documents was referred to in post-hearing submissions. Thus, the content was before the circuit court. Moreover, Harris was granted a new sentencing hearing; thus, her argument regarding Judge Thomas is moot. Moreover, this Court may take judicial notice of Judge Thomas's record in death-penalty cases. As to venue, the cross-examination of Trimble and McCarter, and the State's closing argument, these challenges were adequately addressed on the merits on direct appeal or were barred from Rule 32 review.
Harris's other issues were thoroughly addressed by this Court in its opinion on original submission.
In Part II.A.5. of the main opinion we stated that Harris's claim that trial counsel were ineffective for allowing the prosecutor to misstate the number of blacks on the jury was barred from review because under the principle of relation back that claim did not relate back to her original petition or to her amended petition. Recently in Ex parte Jenkins, [Ms. 1031313, April 8, 2005] ___ So.2d ___ (Ala.2005), the Alabama Supreme Court explained that the Alabama Rules of Criminal Procedure govern the amendment of postconviction pleadings and that the civil doctrine of "relation-back" had no application in the amendment of Rule 32, Ala. R.Crim. P., petitions, and that thus, with certain exceptions, that doctrine could not be used to bar claims presented in an amendment. Thus, that Court expressly overruled that part of Harris relying on the "relation-back" doctrine. Because we also reached the merits of the claim in our opinion, however, the result we reached in Part II.A.5. of our opinion on original submission, remains the same.
APPLICATIONS OVERRULED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
WISE, J., adheres to her original concurrence in part and dissent in part.
NOTES
[1] The Supreme Court addressed only the issue whether "Alabama's capital sentencing statute is unconstitutional because it does not specify the weight the judge must give to the jury's recommendation and thus permits arbitrary imposition of the death penalty." Harris v. Alabama, 513 U.S. 504, 505, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
[2] All of Harris's filings in this casein the circuit court and in this courtwere by counsel.
[3] Harris argues that at trial the prosecution misled the trial court as to the correct number of black jurors selected for the jury. For the reasons stated in Part II.A.5. of this opinion, we disagree. Thus, as on direct appeal, we find that the state used 11 of 19 strikes to remove 11 of 18 black veniremembers. Five blacks served on the jury and one black served as an alternate. However, in Part I, we will address the argument as presented by Harris.
[4] Harris was represented at trial by lead counsel Eric Bowen and cocounsel Knox Argo. Other than the instant case, Bowen had been cocounsel in prosecuting two capital cases and done appellate work on one other capital case. Harris's case was the first time he acted as defense in a capital case. Although Argo had been cocounsel for the prosecution in capital cases, at the time he was assigned to Harris's case he had less than five years' experience in the practice of law and this was the first time he had represented a client during the penalty phase of a capital-murder case.
[5] We note that although the trial court spoke in terms of comparisons between the population of blacks in Montgomery County and the percentage of blacks on the venire, a higher percentage of blacks served on the jury than were present in the venire of 50 from which jurors were selected.
[6] Harris also claims on appeal from the order denying her Rule 32 petition that this Court made an erroneous factual findings on direct appeal. The proper avenue to challenge this court's factual findings is in an application for rehearing.
[7] In maintaining her innocence, Harris rejected the State's plea offer of a sentence of life imprisonment without parole.
[8] Presumably, the significance of having Mrs. Starr as a character witness was that she is the mother of Bart Starr, who played football at the University of Alabama and later for the Green Bay Packers.
[9] The murder of Harris's father was never solved.
[10] Bowen testified that he did not recall the character witnesses from the guilt phase to testify again at the penalty phase because the jury and trial court had already heard their testimony and because he did not want the State to have another chance to cross-examine those witnesses.
[11] Harris was a church employee for many years before Ivey joined the church staff.
[12] Dr. Loring described battered woman syndrome generally as a situation where a woman increasingly fears a man whom she had initially loved, but is now terrified that he will harm or kill her. "There is usually emotional abuse, name-calling, degredation and the like" inflicted upon the woman. (Rule 32 hearing, vol. 16, p. 251.) The woman may feel helpless, suffer low self-esteem, depression, or panic, and may lash out to protect herself. After an abusive episode the man might act remorseful and promise to never do it again.
[13] Dr. Loring defined PTSD generally as "where an individual experiences something that's beyond the norm of human experience, some kind of horrible, horrific incident or series of incidents. . . . [T]here is either an acute terror that someone experiences or something that's ongoing." (Rule 32 hearing, vol. 16, p. 245-46.)
[14] According to Dr. Shaffer, DES is a condition recognized by the American Psychiatric Association that "measures a condition known as dissociation which involves a splitting off of reality, whereby certain memories and perceptions are unavailable to the patient at specific times." (Rule 32 Record vol. 2, page 327.)
[15] We acknowledge that the evidence from the guilt phase of the trial was properly before the trial court for its consideration during the penalty phase and that it did not have to be re-presented during the penalty phase of the trial.
[16] Fawbush interviewed only Harris before submitting his report. He admitted on cross-examination by the State that favorable conclusions in the report were based on conversations with Harris and defense counsel and not on any independent investigation.
[17] "With the recent adoption of § 15-18-82.1, Ala.Code 1975, Alabama's method of execution was changed from electrocution to lethal injection. Therefore, any issue concerning the constitutionality of electrocution has been rendered moot by the adoption of this alternate method of execution." Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003).
[18] In Harris's brief on appeal, this claim is contained under subsection "C" of Part II. Part II of Harris's brief alleges claims of ineffective assistance of counsel. However, claim "C" asserts error on the part of the circuit.